## WILLIAM R. WILSON

*v.*

## GEORGE SEEBER and PHILLIP SCHAUBLE et al.

[Decided May 15th, 1907.]

1. In a proceeding by an attorney to obtain part of the proceeds of a compromise of a suit as compensation under a contract of retainer, evidence examined, and *held* to show that the contract was made.

2. Where an attorney contracted with his client that, as compensation for conducting the suit, he should receive one-third of the proceeds of the action, the contract gave him an equitable lien upon the proceeds when they took form.

On order to show cause. Heard on bill and affidavits, and answer and affidavits.

*Mr. Alan H. Strong,* for the complainant.

*Mr. Edward M. Colie,* for the defendants.

PITNEY, ADVISORY MASTER.

This is a contest over a part of a sum of money, which, at the time of the filing of the bill, December, 1906, was in the shape of a promissory note or notes given by the defendant Seeber to the defendant Schauble, and which notes were, I believe, in the hands of the defendant David.

At the filing of the bill an order to show cause, with *interim* restraint, was made thereon returnable in January, 1907. Later, on the 15th of January, by consent of all parties, the notes in question were paid under order of the court, and enough of the proceeds to cover complainant's claim were committed to the custody of the defendant David, to be held by him as trustee in an account in bank in his name as such trustee, and subject to the order of the court. That fund, now in immediate control

and custody of the court, was the proceeds of a compromise of a suit brought by bill in this court on September 1st, 1906, by Schauble against the defendant Seeber, in which the complainant herein, Mr. Wilson, a solicitor of this court, was solicitor. This suit, he contends, was brought by him in pursuance of a preliminary contract made between himself and the defendant Schauble, by which Wilson was to have one-third of the proceeds of the suit, and the fund in court aforesaid is admitted to be a part of the proceeds of a settlement of that suit.

Two questions are involved, both of which must be resolved in the complainant's favor in order to give him the relief now sought.

*First.* Was the contract made as alleged?

*Second.* Did it give him, Wilson, such an interest in the proceeds of the suit as to enable him to maintain this equitable action?

The first question is one of fact, and its solution depends upon the consideration of a variety of circumstances and a careful examination of several rather bulky affidavits. For present purposes, it will be sufficient if I shall find that it is probable that on the final hearing of the cause, and an opportunity on each side for cross-examination, the complainant will succeed in establishing the contract.

The complainant's contention is, in brief, as follows: In October, 1904, Schauble was the owner of one hundred and seventy-nine shares of the capital stock of the Rising Sun Brewing Company, and in that year transferred the same, for the sum of $130,000, to one Nugent, who really bought in the interest of the defendant Seeber, to whom the stock was subsequently transferred, and in whose name it has since stood.

Schauble subsequently thought that he had been unfairly dealt with in the transaction. At and subsequent to that time, Judge Gilhooly, of Elizabeth, was his standing counsel in important matters, but Mr. A. J. David, a young lawyer in Elizabeth, was employed by him in unimportant matters. On divers occasions, and particularly in the early part of 1906, Schauble consulted with Judge Gilhooly as to his right to undo the transaction and recover the shares of stock, and wished to employ him

to bring a suit for that purpose. Judge Gilhooly expressed doubts as to the prospect of a recovery, and finally declined to be retained for that purpose, stating that he had been somewhat involved in transactions connected with or growing out of the transfer of the stock, and suggested to Schauble that he employ the complainant Wilson for that purpose. Shortly after, and in the summer of 1906, Schauble called upon Wilson and expressed a wish to employ him, but stated that he had no money to invest in the suit, and desired that Wilson undertake it on shares. He gave Mr. Wilson the particulars of the case. That gentleman, learning from Mr. Gilhooly that he had no objections to his (Wilson) undertaking the suit, did undertake it, upon the agreement, as he swears, that he was to have one-third of the proceeds and to run all the risks of expenses and costs, provided that, after an examination of the circumstances, he thought it could be successfully carried through. He did make this examination, and commenced the preparation of his bill and affidavits, which I have seen, and they show a great deal of labor.

At the same time, before filing the bill, he asked Judge Gilhooly to draw a written agreement between him and Schauble as to compensation, which Gilhooly did, and which Wilson handed to Schauble, and which he said Mr. Schauble agreed to and promised to execute.

Before the agreement, however, was actually executed it came to the knowledge of Wilson that there was a scheme on foot by which the ownership of these shares of stock by Seeber might within a very short time be transferred to some other person, and he thereupon hurried matters, finished the preparation of Schauble's affidavit, and came before me on September 1st, 1906, at Morristown, with Schauble, and upon presentation of the bill I advised an order to show cause, with *interim* restraint against the transfer of the stock by Seeber.

Naturally, and at once upon obtaining this order, the question arose where the money was to come from in case Seeber should immediately tender a retransfer of the stock and demand a return of the purchase price, and Schauble at once asked the assistance of Wilson in procuring money for him. Nothing was said in the written unsigned contract which made it the duty of

Wilson to raise any money. Mr. Wilson applied to Mr. Gilhooly and learned from him that Mr. Isham, an Elizabeth capitalist, would advance the money, provided he could have the stock for the sum of $155,000. Mr. Schauble, upon learning this from Wilson, agreed to it generally, or in part. Either Wilson or Gilhooly had prepared a contract to that effect to be signed by Schauble. That contract, however, was nominally with Judge Gilhooly, Isham's name not being mentioned in it. Objection was made to this contract by Schauble because it did not provide for protecting him against a suit which had been brought by the brewing company to enforce a large claim against him, which was then pending, and he wished that the sum to be paid him by Judge Gilhooly for the one hundred and seventy-nine shares of stock should be over and above any amount that he, Schauble, should be obliged to pay as a result of the suit of the brewing company against him.

In this state of affairs Mr. Wilson and Mr. Schauble met by appointment early in the morning at Judge Gilhooly's office, Schauble having both contracts in his possession—*first,* the one Judge Gilhooly had drawn between Wilson and Schauble, and *second,* the one between Schauble and Gilhooly for the sale by Schauble to Judge Gilhooly, acting for Mr. Isham, of the shares of stock, if recovered.

Mr. Schauble then informed Judge Gilhooly that he was entirely satisfied with the contract with Mr. Wilson for his compensation, but he wished the contract for the advancement of the money and the sale of the stock to Gilhooly to be amended in the respect previously mentioned. Mr. Gilhooly thereupon drafted a new contract between himself and Schauble, which was supposed to, and did in fact, cover the objection. Upon this new draft being shown to Schauble he expressed no dissatisfaction with it, but said that before executing it he wished to submit it to Mr. David. This remark seems to have irritated Judge Gilhooly, and he declared that he would have neither of the papers executed in his office, and hastened the departure of Mr. Schauble. The result was that neither the contract with Mr. Wilson or that with Judge Gilhooly was ever executed.

On the return of the order to show cause, Mr. Wilson em-

ployed Mr. Marsh, of Plainfield, as assistant counsel, and the hearing went over by consent.

In the meantime Schauble seems to have become either suspicious of complainant's sincerity in his devotions to Mr. Schauble's interest in the suit, or his ability to properly conduct it, and, besides employing Mr. David, sought to employ Mr. Colie, of the Essex bar, and asked Mr. Wilson to go with him to Mr. Colie's office as soon as the latter should return from Europe. A meeting took place at Mr. Colie's office about September 13th, in which the subject of Mr. Wilson's compensation was taken into consideration, Mr. Wilson insisting upon his contract in writing as already agreed upon, and that it should be signed. Mr. Colie, after hearing all the parties, acting as counsel for Schauble, prepared another agreement, which distinctly recognized and provided that complainant should have one-third of the recovery and one-third of any compromise, but in a subsequent clause provided that Schauble might discharge Wilson at a certain stage of the cause by paying him a comparatively small sum of money. This contract Wilson declined to sign.

I have stated Mr. Wilson's contention. It is thoroughly supported by his own affidavits, and as to the consent of Schauble to the terms of the contract, it is sustained by the affidavit of Judge Gilhooly. It is also sustained by the account of what occurred on the 13th day of September in the office of Mr. Colie. It is quite impossible to account for the provision for one-third compensation found in the contract prepared by Mr. Colie except upon the assumption that such proportion had been previously agreed upon.

The defendant Schauble, in opposition to the deposition of Judge Gilhooly and complainant, denies some of the allegations of the circumstances leading up to his employment of Mr. Wilson, and he denies that he ever agreed to give one-third, and he denies a part of what occurred in Judge Gilhooly's office on the occasion when the judge swears that the second draft of the contract was prepared by him between himself and Mr. Schauble. But I think that denial, when carefully examined and compared with the other affidavits, is not sufficient to overcome their probative force, and I think that the great probability is

that at the final hearing the complainant will be able, by clear preponderance of proof, to show that the written draft of a proposed contract between himself and Schauble was clearly assented to by Mr. Schauble, and that the suit which was commenced by him was so commenced on the strength of that contract.

I am entirely satisfied that Schauble was aware that Wilson prepared the bill and affidavits, and appeared before the vice-chancellor and procured an order to show cause, and employed assistant counsel on the occasion of the return of that order, upon the honest supposition that the written agreement which had been prepared, but not executed, was agreed to by Schauble, and would be executed. If I am right in this conclusion from the affidavits and circumstances of the case, then upon plain principles the mere non-execution of the contract is of slight importance.

No answers were ever put in to complainant's bill, and the result was that in the latter part of October that suit was settled by Schauble, behind complainant's back, by paying or securing to Schauble the sum of $40,000, a portion of which, sufficient to pay the complainant, is, as before mentioned, now in the custody of Mr. David and under the control of the court.

The second question is whether that contract gives such an interest in the proceeds of that settlement as to enable the complainant to succeed in this suit.

The paper itself, prepared by Judge Gilhooly, purports to be dated on the        day of August, 1906, and recites that Schauble had stated to Wilson the facts and circumstances attending the transfer of the stock, and that Schauble claims that the same was procured from him by fraud, and that he is now the owner of the stock, and that it is worth a larger sum than Seeber paid him, and that Schauble has asked Wilson to take proceedings to have the transfer set aside and the stock returned to him, and had proposed to Wilson that his compensation should be paid out of the sale of the stock when recovered, and not otherwise, and that Wilson should pay the court expenses, and that, in consideration of his services and assumption of costs, Schauble should pay Wilson a sum equal to the one-third part of the value

of the stock over and above the amount for which it was sold to Seeber. Then comes the contract itself—that Wilson should commence suit in chancery praying for the annullment of the sale and a recovery of the stock, and

"will devote his best endeavors and energies in the prosecution of the suit until its final determination, and agrees to accept as compensation for his services and for such disbursements as he may be required to make, the one-third part of the value of said stock over and above the amount or sum paid by Seeber to Schauble, or the amount or sum that may be required to be paid by Schauble for the redemption of said stock."

This event has never happened, but then follows this further provision:

"And he further agrees that in case a compromise is made by his consent in writing or settlement otherwise effected, in like manner to accept in payment of his services and disbursements as aforesaid the one-third part of the amount paid upon such compromise or settlement whether the same be received by said Schauble or not."

Then follows this covenant on the part of Schauble:

"And the said Philip Schauble on his part, on performance by said Wilson of the services and covenants above named, agrees *to pay said Wilson the one-third part of whatever money shall be paid or received* by said Schauble or by any other person on his behalf in compromise or settlement of the aforesaid claim."

There was a further agreement on his part that he would not settle or compromise, or sell or dispose of, his interest in the stock without the consent, in writing, of Wilson; and further,

"that if there is a decree that the stock shall be returned to Schauble that he would pay to Wilson one-third part of the value of the stock over and above the amount required to be paid by him for the redemption of the stock."

Then follows a definition of what is meant by the "value of the stock."

It is not necessary for present purposes to consider whether the agreement for one-third of the value of the stock, taken in connection with the clause providing against a settlement of the

claim or a transfer of the stock without the consent of Wilson, gave Wilson an interest in the stock itself, for it seems to me that the sole question for present purposes is the true construction of the clause by which Schauble

"agrees to pay said Wilson the one-third part of whatever money shall be paid to or received by Schauble or by any other person on his behalf in compromise or settlement of the aforesaid claim."

A great many authorities were cited by counsel on each side, showing commendable industry and research. I have gone through them all.

The general rule undoubtedly is that it must appear that the complainant has an interest, by the contract, in the very fund itself; either existing at the date of the contract or thereafter to come into existence.

In examining and considering the authorities, two matters must be borne in mind—*first,* that in England, and in many of the states of the union where the common-law doctrine of champerty still prevails, the question could not arise, and hence they are no authorities, and *second,* in examining the English cases, a rule arising out of their Bankrupt law, dealt with by me in *Board of Education* v. *Duparquet, 50 N. J. Eq. (5 Dick.) 234* (and see *Ward* v. *Duncombe, L. R. App. Cas. 369* (at *p. 383 et seq.*), *Lord Macnaughten, 1893*), must be borne in mind, since it has no application here.

Moreover, it must be remembered that this is not, in its present shape, a suit in which a third party is interested, but between the sole parties to the contract themselves.

It may, for present purposes, be admitted that a mere promise to pay *out of* a particular fund when received by the promisor will not amount to an assignment of an interest in the fund. I noticed this rule in *Lanigan* v. *Bradley & Currier Co., 50 N. J. Eq. (5 Dick.)* (at *p.* 205, near the bottom). The cases referred to by the learned annotators of *2 Lead. Cas. Eq. 1644* were those where the fund sought to be charged was in nowise connected with, or the result of, the transaction out of which the debt arose which it was sought to charge upon it.

On the other hand, it seems clear that an order by a debtor in .

favor of his creditor, addressed to a third party, to pay that creditor out of a certain fund, either then existing or thereafter to exist, in the hands of that third party, gives an interest in that fund to the party in whose favor the order is drawn. And further, it may be said with safety that the rule is that the solution of the question will depend upon the proper construction of the language of the contract—whether that language be committed to writing or not—to be taken in connection with all the facts and circumstances of the case.

So construed, it seems to me that the complainant's case is free from serious doubt.

The first important element is that the fund in question is the immediate result of the litigation instituted by complainant, and is the very fund mentioned in the contract. In the next place, no other creditor or assignee is claiming it, and the case is free from all complications arising out of conflicting claims between two creditors or two assignees of the same fund, such as we find in most of the adjudged cases.

And the language is clear. Schauble agrees to pay Wilson "one-third part of whatever money shall be paid to or received by Schauble" by way of compromise, &c. The language is not to pay a sum equal to one-third, but to pay *the* one-third part.

The question of the effect of several such writings making up a contract was discussed first by Lord Langdale, as master of the rolls, in *Rodick* v. *Gandell, 12 Beav. 325,* and, on appeal from his decision, by Lord Truro, lord-chancellor, as reported in *Rodick* v. *Gandell, 1 De G. Macn. & G. 763 (1851, 1852),* where there is an exhaustive examination of the authorities.

Subsequently, in 1855, the subject came before Sir W. P. Wood, vice-chancellor, afterwards Lord Hatherly, in *Riccard* v. *Prichard, 1 K. & J. 277; 1 Jur. (N. S.) 750.* The vice-chancellor there abstracts the rule laid down by Lord Truro, *supra,* thus (*1 Jur., N. S.*), "that where there is an agreement between debtor and creditor that the debt owing shall be paid out of a particular fund coming to the debtor that creates a valid equitable charge upon the fund and operates as an equitable assignment of the fund *pro tanto.*"

These English cases are all based upon the decision of Lord

Hardwicke, in *Row* v. *Dawson, 1 Ves. Sr. 331* (*1749*). There Tonson and Conway loaned money to Gibson, who, by way of reimbursing those gentlemen, drew a draft on Swinburne, who was the deputy of Horace Walpole, a member of the cabinet in charge of the exchequer of England, with these words added: "Out of the money due to me from Horace Walpole out of the exchequer and what will be due at Michaelmas pay to Tonson and. Conway, value received." Gibson became bankrupt and the question was whether the holders of this draft were first entitled to be paid the amount of the draft out of the moneys due to Gibson from the exchequer. Lord Hardwicke held that the draft was clearly distinguishable from an ordinary bill of exchange and worked an assignment of so much of the money due to Gibson in favor of Tonson and Conway and gave them a preference.

Lord Hatherly's terse statement of the rule was approved by Mr. Justice Dixon in his opinion in *Terney* v. *Wilson, 45 N. J. Law* (*16 Vr.*) *282*. The supreme court was there exercising its equitable jurisdiction in the matter of set-off to a judgment.

And the same doctrine was acted upon in *Brown* v. *Dunn, 50 N. J. Law* (*21 Vr.*) *111*, also a case of the exercise of equitable jurisdiction by the court.

There is a case in New York of *Williams* v. *Ingersoll, 89 N. Y. 508*, which deals with the construction of instruments of this character, which seems to show that the law in the State of New York was, at one time, somewhat different. · The learned judge there states (at *p. 518*) that "whatever the law may be elsewhere it must be regarded as the settled law of this state that an agreement either by parol or in writing to pay a debt out of a designated fund does not give an equitable lien upon the fund or operate as an equitable assignment thereof," but he proceeds in that very case (at *p. 521*) to state a rule of law which seems to me directly in conflict with that previously stated. He uses this language: "It is not important to inquire here whether the agreement proved by the plaintiffs was an agreement to assign or an agreement for a lien upon any sum which might be recovered, for either agreement would have the same effect, as the plaintiffs' claim is for the full amount of the award. The agree-

ment was not alone that the plaintiffs should be paid out of any sum recovered. Such an agreement, as I have above shown, would not have been sufficient to give the plaintiffs any claim upon the award. But there was also proof tending to show that it was the intention to assign to the plaintiffs or to give them a lien upon any sum recovered and retain out of it their compensation, and to pay the balance, if any, to Heath; and for the purpose of upholding the judgment we may assume that the trial judge found any facts which the evidence tended to establish. The form of words used in making the agreement is not alone to receive attention, but all the circumstances of the transaction are to be considered."

This was accompanied by an elaborate examination of the authorities and resulted in an unanimous decision of the court in favor of the lien in that case.

The later New York cases seem to have abandoned the seeming doctrine of the older. *Holmes* v. *Evans, 129 N. Y. 140,* is an example, and also a still later case of *Harwood* v. *La Grange, 137 N. Y. 538,* decided in 1893. The headnote of that is as follows:

"That when an attorney renders services in an action under an agreement that he shall receive his compensation *out of the proceeds thereof* he has an equitable lien upon or ownership as equitable assignee in such proceeds."

And the court, in sustaining that principle, refer to *Williams* v. *Ingersoll, supra; Fairbanks* v. *Sargent, 104 N. Y. 104; Boyle* v. *Boyle, 106 N. Y. 654,* and *Chester* v. *Jumel, 125 N. Y. 237.*

Defendant relies upon the recent case of *Weller & Lichtenstein* v. *Jersey City Street Railway Co., 68 N. J. Eq. (2 Robb.) 659.* In that case the decision against the solicitors went on the grounds, in the first place, that the claim against the railway company was in its nature not capable of being assigned; and that there was in point of fact no actual product of the litigation, and no fund capable of assignment, and that the parties had a right to settle between themselves, which they had done. The suit was not, as here, by the solicitors against their client,

but by the solicitors against the defendant, the railway company, in the suit which they had brought for their client. That circumstance and the nature of the action—tort for personal injuries—combine to distinguish it from the present case.

The same may be said of several other cases cited by the defendant. For instance, *Kusterer* v. *City of Beaver Dam, 14 N. W. Rep. 617.* That was also an action for personal injuries against the city, where the plaintiff had entered into a contract with his attorneys to conduct the suit upon shares, and after issued was joined the city settled with Kusterer and took a release under seal, which they were allowed to plead *puis darrein,* and at the trial the court dismissed the action against the protest of the attorneys, and the latter appealed. It was held that it was impossible to grant the attorneys relief in the suit. The court made this remark: "Impressed with the equity of the claim on the part of the attorneys for the plaintiff, we have carefully reviewed many decisions with the view, if possible, of protecting them, at least to the extent of the taxable costs. But as the cause of action was not assignable, and hence remained, prior to judgment, under the absolute control of the plaintiff," the court concluded it was unable to assist them.

Another case is *Williams* v. *Miles, 63 Neb. 851; 89 N. W. Rep. 455.* That was a bill to set aside the probate of a will which had been instituted by several parties claiming under a supposed later will and as heirs-at-law. The solicitors had undertaken it under a contract for a share of the estate. After a defeat of the plaintiffs in the court below, and also on appeal, three of the plaintiffs moved to dismiss the bill of complaint as against themselves on equitable terms. This was resisted by the solicitors and it was held that they could not resist it. The court remarked: "Had the action proceeded to judgment on which would attach a lien in favor of plaintiff's attorneys, or were the controversy of such a character as to bring funds, money or property into the possession of the court or custody of the law on which the plaintiff's attorneys could claim a lien, legal or equitable, for the value of the professional services," &c., the court then asserted it had power to act, but went on to show that it would be impossible to compel the moving plaintiff to continue

the action. The court did not determine as to whether the contract in that case, which seemed to be similar to that in this case, created a lien or not.

Another case cited is *Cameron* v. *Boeger, 65 N. E. Rep. 690 (1902)*. The contract in that case was much like the present, and there was an attempt by the solicitor to open a decree of dismissal of the suit which had been entered by consent of the plaintiff in the suit behind the solicitor's back, and the court held it could not be done. The learned judge, however, pro-ceeded to go into the merits and expressed the opinion that, according to the decisions in Illinois, the solicitor's contract gave him no lien on the fund.

One other western case cited by complainant is worthy of notice, viz., *Canty* v. *Latterner, 31 Minn. 239; 17 N. W. Rep. 385*. That, as here, was an action by an attorney against his client, and the subject of the suit was in court. There a contract had been made by the defendant with the attorneys that they should prosecute an action against a railroad company to recover the amount due from the latter to the former for damages to his land by reason of the railroad company occupying it, and receive for his services a certain sum if he won the cause and nothing if he failed to do so; and the contract contained this further clause:

"I hereby agree that he (the attorney) shall receive said money from the Minnesota and St. Louis railroad out of the amount due me from said railroad company for running through my land, to be paid when suit is settled."

It was held that that contract amounted to an equitable assignment of the portion of the chose in action referred to entitling the attorney to receive the same specifically, and the railroad company having paid the money into court, it was held that he had a lien on the fund in court to that extent.

A consideration of all the cases cited do not alter the view above expressed, that the intention of the parties hereto, namely, the complainant, Wilson, and Mr. Schauble, was to have one-third of the very proceeds of the action, and that the contract gave him an equitable lien upon those proceeds when they took

form, and that this result is in accordance with equity and good conscience.

The defendant sets up against the whole of the complainant's case a charge that the complainant was not, in all that he did, in reality working for Schauble's interest, but that he was really working in the interest of Mr. Isham. Defendant asserts that Isham was under a contract to purchase this stock from Seeber at a date just after the 1st of September, which required a large amount of money on Isham's part; that the money market at that time was very stringent, and that Isham wished this injunction to be granted in order that he might be relieved of the necessity for carrying out his contract just at that time, and that the procuration of the injunction was in reality the scheme of Isham, devised and set on foot by him and his attorney, Judge Gilhooly, the real object of which was to relieve Isham.

He further asserts that it was a part of the scheme that advantage was to be taken of Schauble's necessity for money to extort from him a contract to sell the stock to Isham, and that Wilson, the complainant, was a party to the whole scheme. Without going into the details, it is enough for me to say that these assertions of defendant do not seem to me to be established by the affidavits in connection with the circumstances, to such a degree as to justify me in using them at this stage of the case in defeating complainant's lien on this fund. The great difficulty in adopting that view is that, in its worst aspect, it still left or resulted in a great benefit to the defendant. It put a large sum of money in his pocket. He was put into possession of facts and circumstances which went to support his claim to the stock which he had been seeking for a considerable time to enforce, and which he was unable to find any lawyer to take up, and which facts and circumstances, when set forth in a bill and supported by affidavits, procured by Wilson's industry, and possibly and probably with the help of Judge Gilhooly, the defendant, Seeber, was unable to meet, and finally was willing to pay $40,000 in settlement.

It is further said that Wilson was all the while urging his client, Schauble, to accept Isham's proposition to furnish the necessary redemption funds, and that he declared that he felt

bound to furnish the money. I have already called attention to the fact that there was no such undertaking on his part found in the written contract. At the same time he was naturally anxious to have Mr. Schauble provided with means necessary for the recovery of the stock, and very likely urged him to sign the second contract prepared by Gilhooly by which he was to receive $25,000, beside a payment not exceeding $7,500, for the purpose of settling the suit of the brewing company against himself.

That situation sufficiently, for present purposes, explains certain clauses in some of the affidavits made by the complainant in the main cause of *Schauble* v. *Seeber,* in opposition to a motion to dismiss that cause, which he resisted.

Upon the whole case I come to the conclusion that the restraint should be continued until the final hearing.