Complainant seeks to impress a trust on a fund of $25,021.56 in the hands of defendant bank. The money was deposited in the bank to the credit of "Special Building Account, David Zaritsky," and after Mr. Zaritsky's death, was applied by the bank to the payment of notes of which Zaritsky was maker or endorser. To succeed in her suit, complainant must show a title in the deposit superior to that of the bank. The fund arose in this manner:
Complainant held a mortgage for $75,000 on property owned by Zaritsky. The mortgage contained the usual fire insurance covenant. In the bond it was agreed that the mortgagee would consent to the use of the proceeds of the fire policies for the repair of the building, provided, however, that the obligor or his assigns should repair the building so that it would be in as good condition as before, and that the cost of repairs above the proceeds of the policies should be provided and paid by the obligor or his assigns. Pursuant to the covenant contained in the mortgage, Zaritsky procured and delivered to complainant, insurance policies with the standard mortgagee clause endorsed thereon. Early in the spring of 1932, the building on the mortgaged property was badly damaged by fire. The loss was settled for $45,000, of which $18,578 was applied to the payment of taxes, interest and other purposes. The balance, $26,422, was deposited with the defendant bank in the account above mentioned.
Before the account was opened, complainant and Zaritsky talked over the situation and agreed that so much of the insurance money as necessary should be applied to the reconstruction of the building. They evidently decided that the money should be deposited by Zaritsky in a special account, for complainant told him that he must be careful in opening the account to word it correctly. The insurance drafts were *Page 550 
payable to complainant and Zaritsky jointly and they were not collectible unless accompanied by the insurance policies. Complainant endorsed the drafts in blank and gave them with the policies to Zaritsky, who delivered them to the bank for collection. Two of the drafts totaling $22,294 were thus handled when he opened the account on July 26th, 1932, and a third draft for $4,128 was deposited in the account August 9th, 1932. Zaritsky, in his lifetime, drew only two checks on the account, one on August 12th to the general contractor and the other on August 19th to the insurance adjuster. Each time, before making the check, Zaritsky telephoned complainant to secure her approval of the payment out of the special account. Complainant's secretary, Mr. Porter, about the middle of August had a talk with Zaritsky about having checks on the building account counter-signed by complainant or her representative, but no such arrangement was actually made.
Complainant, as the person named in the mortgagee clause endorsed on the policies, had title to the proceeds thereof, subject, however, to her consent that the proceeds be used by Zaritsky for repairs. Conversely, Zaritsky was obligated to repair. By endorsing and delivering the drafts, complainant surrendered title to the proceeds of the policies. If complainant relied, for the restoration of the building, solely on Zaritsky's general credit, then she had no interest in the deposit with the defendant bank. But if she and Zaritsky intended that that particular money should be applied to repairs as agreed in the mortgage bond, and for no other purpose without complainant's consent, then I think she had an equitable lien on the fund to secure performance of Zaritsky's obligation. This is true even though she put it within Zaritsky's power wrongfully to divert the fund to another purpose.
In Smithurst v. Edmunds, 14 N.J. Eq. 408, 417, Chancellor Green quotes Mr. Justice Story on equitable liens: "It seems to me the clear result of all the authorities, that wherever the parties, by their contract, intended to create a positive lien or charge, either upon real or personal property, *Page 551 
whether then owned by the assignor or not, or if personal property, whether it is then in esse or not, it attaches in equity as a lien or charge upon the particular property as soon as the assignor or contractor acquires a title thereto against the latter and all persons asserting a claim thereto under him, either voluntarily or with notice, or in bankruptcy." The subject is discussed in 3 Pom. Eq. Jur. §§ 1234, 1237. Professor Pomeroy says that the doctrine of equitable liens is an application of the maxim, equity regards as done that which ought to be done; that an express executory agreement whereby the contracting party sufficiently indicates an intention to make some particular fund therein identified a security for a debt or other obligation, creates an equitable lien thereon; that the form of the agreement is not very material, for equity looks at the purpose and if the intent appear to charge or pledge property as a security for an obligation and the property is so described that the principal thing intended to be given or charged can be sufficiently identified, the lien follows.
It seems to me clear that the parties did intend that the fund should be used for rebuilding. As between complainant and Zaritsky, she had a right to insist that the account be applied to the purpose for which it had been opened. Zaritsky could not use it for any other purpose without her consent, and if the bank stands in no better position than Zaritsky, it is bound by a like limitation.
Porter, immediately after the account was opened, called on Mr. Rean, the bank's credit manager. Rean testified that Porter, whom he knew very well, said: "`David Zaritsky has certain checks that he has agreed to deposit in your bank. Will you tell me if he has done so?' I did not know at that time if the account was opened. I advised Mr. Porter he had opened the account. Mr. Porter asked me the amount of the deposit. I told him. I indicated to him the approximate amount of the deposit and told him the two checks had been deposited. He was particularly interested in the large check and at that time it was not deposited. That was the extent of our conversation." Rean knew Porter's business; that he *Page 552 
was employed by complainant; that her name appeared on the checks which had been deposited in the account, and that the checks were accompanied by the insurance policies. Again, right after the deposit of August 9th, Porter got in touch with Rean and learned that Zaritsky had actually deposited the draft.
Mr. Zaritsky met his death September 21st, 1932. Porter heard of it in the evening and immediately telephoned Rean at the latter's home. Rean testified: "We just discussed Mr. Zaritsky's death and concerning this account, and Mr. Porter asked me if I could tell him the balance in that account. I told him I couldn't; the situation was a complicated one and that he would have to call at the bank and talk the situation over." Next morning Porter went to the bank and was refused information.
I have given Rean's version of these conversations. Porter says that he repeatedly told Rean that the money belonged to complainant. Whatever the words used, I am satisfied that the bank knew that complainant was relying on this fund for the restoration of the building on which she had a mortgage, and that she believed she had a right so to rely.
When the special building account was opened by Zaritsky, the bank held promissory notes made or endorsed by him totaling more than $35,000. By agreement embodied in one of the notes, Zaritsky authorized the bank "at its option at any time to appropriate and apply to the payment and extinguishment of any of the above named obligations or liabilities, whether now existing or hereafter contracted, any and all moneys now or hereafter in the hands of the said company [the bank] on deposit or otherwise, to the credit of or belonging to the undersigned [Zaritsky], whether the said obligations or liabilities are then due or not due." The obligations referred to in the agreement included all notes made or endorsed by Zaritsky. In August and early September, the old notes were renewed with some reduction in the amounts. Then Zaritsky died. Two weeks later the bank, by suitable entries in its books, charged against the building account a note for $130 made by Zaritsky, payable in November, and *Page 553 
three notes in the sum of $20,400 due in November and December, and endorsed by Zaritsky. On October 17th, the bank appropriated the balance of the account to payment of a note of a partnership of which Zaritsky was a member. Two days later, complainant made a demand on the bank for the building fund; the administratrix of Zaritsky's estate formally assented but the bank refused. The present suit followed.
If the bank, pursuant to its agreement with Zaritsky, had used the fund for payment of Zaritsky's liabilities before it had notice of complainant's equity, then complainant could not look to the bank for the money. Hanford v. Duchastel,87 N.J. Law 205. But the bank did have notice at the time it exercised its option to apply the fund to the satisfaction of the notes and this notice was sufficient to preserve complainant's equitable lien as against the bank. Although the bank originally accepted the money for deposit in ignorance of the claim of complainant, this will not defeat her claim. First National Bank v. EasternTrust and Banking Co., 108 Me. 79; 79 Atl. Rep. 4. The bank did not change its position on the faith of this deposit until after it had notice of complainant's equity; until then it remained a volunteer. One of the witnesses for the bank testified that because of this deposit, it accepted renewals with smaller reductions than it would otherwise have done. The reductions, however, after the account was opened, were actually larger than before.
I conclude that Mrs. Hadley's equitable lien is superior to the title of the bank. It does not follow, however, that she is entitled to a decree for payment to her of the amount in the special building account when Zaritsky died. Her only interest is to secure performance of Zaritsky's promise to repair the building and so restore the security of her mortgage. The repairs were to be made purusant to plans which had been approved by complainant in June or July of 1932. There is no evidence as to whether or not these repairs were completed. If necessary, I will take proofs on that point. If the repairs were not completed, I will hear counsel as to the method of disbursing the fund. *Page 554 
Zaritsky's representatives have not been joined in the cause. They formally and in writing waived all interest in the deposit and, as I understand it, both parties to this suit believe that a decree can safely be made disposing of the controversy even though Zaritsky's estate is not represented.