261 N.J. Super. 447 (1993)
619 A.2d 251
VRG CORPORATION, PLAINTIFF-APPELLANT,
v.
GKN REALTY CORP. AND HEATHER CROFT ASSOCIATES, L.P., DEFENDANTS-RESPONDENTS. AND GOLDEN REEF CORPORATION, PERLMAN ENTERPRISES, INC., TILTON SQUARE DEVELOPMENT ASSOCIATES, L.P., AND TILTON SQUARE DEVELOPMENT CORP., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 4, 1993.
Decided January 27, 1993.
*449 Before Judges J.H. COLEMAN, SHEBELL and CONLEY.
Francis P. Maneri argued the cause for appellant (Jubanyik, Varbalow, Tedesco, Shaw & Shaffer, attorneys; Francis P. Maneri on the brief).
Anne C. Singer argued the cause for respondents (Blank, Rome, Comisky & McCauley, attorneys; Anne C. Singer on the brief).
The opinion of the court was delivered by CONLEY, J.A.D.
Following a nonjury trial, final judgment was entered in favor of defendant GKN Realty Corp. and Heather Croft Associates (hereinafter collectively referred to as GKN) dismissing plaintiff VRG Corporation's (VRG) claim for an equitable lien upon certain rental income generated by a shopping center, presently owned by GKN, in payment for a brokerage commission owed VRG by bankrupt defendants Golden Reef and Perlman Enterprises.[1] We reverse.
*450 The pertinent facts are not in dispute. VRG Corporation is a commercial real estate brokerage firm incorporated in New Jersey. Beginning in 1984, VRG assisted Golden Reef, a New Jersey corporation, and Perlman Enterprises, a Florida corporation authorized to do business in New Jersey, with the development of Heather Croft Square, a shopping center. In addition to assisting with the design, financing and necessary zoning approvals for the shopping center, VRG procured tenants for Golden Reef and Perlman pursuant to an Exclusive Agency to Lease Agreement. Entered into in October 1985, the agreement granted VRG an exclusive agency to procure tenants for Heather Croft Square "[i]n consideration of services to be rendered by [VRG]." Paragraph four of the agreement concerning compensation for procuring tenants, provided that VRG:
shall be entitled to a commission for each tenant who enters into a lease for space in the Center during the term of this Agreement equal to six (6%) percent of each monthly gross base rental payment under the initial term of such lease. Each such monthly commission payment shall be paid by [Golden Reef] to [VRG] within ten (10) days after receipt by [Golden Reef] of the subject monthly rental payment....
Provision was made in the agreement for the advance payment of $250,000 of the commission owed:
[Golden Reef] shall pay to [VRG], as advance commissions hereunder, the sum of One Hundred Thousand and No/100 ($100,000.00) Dollars on or before November 1, 1985 and the further sum of One Hundred Fifty Thousand and No/100 ($150,000.00) Dollars on or before the date that the first tenant takes possession of leased space in the Center and commences to pay monthly base rental. Such payments of Two Hundred Fifty Thousand and No/100 ($250,000.00) Dollars shall be credited against the commissions due [VRG] pursuant to paragraph 4 above and [Golden Reef] shall not be obligated to make any payments to [VRG] pursuant to paragraph 4 above until such time as said credit of Two Hundred Fifty Thousand and No/100 ($250,000.00) Dollars has been exhausted.
The agreement, further, bound the successors and assigns of the parties.
Catherine Backos, a licensed New Jersey real estate broker and the Vice President of VRG, negotiated the agency agreement. Originally, she had attempted to negotiate payment on a *451 discounted basis of all commissions due at the time the shopping center opened. However:
what took place was that the then developer-owner of the center, Stuart Perlman, who's deceased, agreed to pay us at the time when the center opened $250,000 on account, which $250,000 would be charged off against each month's rental income stream at six percent.
....
It was  there had been a draft of this contract in Mr. Perlman's hands, okay, which stated that we wanted to be paid off on a discounted basis. That is six percent of the first year, five percent of the second year, and four percent of every year thereafter 
....
... Mr. Perlman came to me and said, no, he said, this is what I wish to do. I don't wish to pay you that large consideration, I believe it was $583,000 which was the discounting.
....
Of all of the leases out over 20 years. He said, I want to pay you $250,000 now and I want you to continue to have a six percent income stream from this property. Will you accept this? And I said, yes, I will. And so we entered into this exclusive agency.
[Emphasis added].
VRG's compensation, then, "was exclusively based on the amount of income generated by [the] leases." Thus, "[i]f a tenant defaults and no longer pays rent then we no longer calculate any six percent income stream from that particular tenant." In addition to agreeing to Perlman's insistence that the commission be paid in the form of the $250,000 initial payment to be credited against monthly rents and thereafter "a six percent income stream from [the] property," Backos also agreed to a removal from the original draft agreement of a provision that would ensure an accelerated payment from the proceeds of any sale of the property of all commissions due. As Backos explained:
when I was negotiating with them my original draft of the contract had a provision in there that in the event  and it's my standard contract  that the property is sold, they then take and pay the commissions off on the discounted basis, okay? Mr. Perlman said to me at the time, Catherine, this is a long-term holding, I'm going to leave this property to my kids, I want to set this up as an annuity for you. You will have six percent going out. Take that language out of the contract.

[Emphasis added].
*452 VRG obtained tenants and Heather Croft Square opened in December 1986. At that time VRG was paid the $250,000 advance payment pursuant to paragraph five of the agreement. Credited against the 6% commissions from the monthly rentals, VRG calculated that the $250,000 advance would have been exhausted and payment from the monthly base rents would have commenced in March 1992.
In June 1989, however, Golden Reef and Perlman sold the shopping center and assigned the leases to GKN. When Backos learned in January 1989 of the impending sale, she initially advised GKN's real estate counsel, Donna Steinberg, that "we had an ongoing commission contract with Golden Reef Corporation and that if the property was being sold, I wanted her to be aware that there was an ongoing obligation by the landlord to pay a six percent commission for these leases that were in that center." Sternberg contacted David Nussbaum, a vice president of GKN Realty, to inform him of Backos' call. Subsequently, Nussbaum and Roger Gladstone, another vice president of GKN Realty, met with Backos and Val Galasso, the President of VRG. Backos testified that she informed Nussbaum and Gladstone of "the services that we had performed and that there was an ongoing obligation by the landlord to pay ... the six percent commission on each of the leases that we had obtained."
After the meeting, GKN requested certain information with respect to the exclusive agency agreement. On February 6, 1989, Backos faxed a letter to Nussbaum and Gladstone indicating that the amount of commissions due VRG from Perlman Enterprises at the closing of the sale of Heather Croft Square to GKN Realty was $309,388.96. Documentation faxed to GKN on February 6, 1989 included a copy of the Exclusive Agency Agreement, the extension of the agreement, VRG's calculations of commissions due, and a copy of VRG's January 10, 1989 letter to Perlman Enterprises concerning commissions due.
*453 Backos attempted to negotiate with Golden Reef and Perlman for a payment of VRG's commission at the time of closing. After some dispute, she agreed to accept $236,919.79 as full payment for all commissions. In her June 12, 1989 letter to Clifford Perlman advising him VRG would accept that amount, she further stated that VRG would attend the closing, scheduled for June 13, and expect full payment at that time. Perlman told her not to attend and that VRG would be paid the following day. Nussbaum also advised Backos not to attend the closing since it might "fall apart" if she were there and demanded payment. Although disputed by Nussbaum, Backos testified that while she agreed not to attend, she told Nussbaum that if the commission obligation was not satisfied at closing, VRG would look to GKN for the commissions. Indeed, although the initial contract between Golden Reef and GKN made no reference to any potential liability for commissions owed VRG, subsection 12(W) under "Seller's Warranties and Representations" ultimately provided:
There are no leasing or brokerage commissions due, unpaid or accruing with respect to the Leases; there are no ongoing obligations to pay any leasing or brokerage commissions under the Leases; and, there are no leasing or brokerage agreements in effect with respect to the Leases; except with respect to certain leasing commissions which may be due VRG Corporation, for which Seller hereby agrees to defend, indemnify and hold Buyer harmless from all liabilities, claims, causes of action, damages, costs, losses and fees (including attorney's fees) incurred by Buyer in connection with any such commission to VRG Corporation.
Nussbaum testified that 12(W) was amended to include the indemnification provision after discussions with VRG and the Perlmans concerning VRG's claim of commissions due.
In rejecting VRG's claim of an equitable lien upon the rental income received by GKN pursuant to the sale and assignment of leases that VRG had procured, the trial judge said:
The law is clear; there must be some manifestation of intention to have some particular property subjected to the payment of a debt. However, in this case, I find no intention by GKN or Golden Reef that the rental payments serve as security for the payment of VRG's rental commissions.
VRG negotiated a contract with Golden Reef to locate long-term tenants for Heather Croft Shopping Center. During the negotiations, the parties agreed on *454 a formula for calculating the compensation due VRG for its services. VRG's commission was to be calculated at six (6%) percent of the base rent for the initial term of the lease, with such base period running from five (5) to twenty (20) years.
This is a simple calculation and, perhaps, best compensates VRG for its work. However, the parties were free to negotiate any basis for payment. They were not limited to using rental payments as a base. For instance, it was possible to base VRG's compensation on the time expended on locating tenants. Payment could also have been in one lump sum. Just because the parties agreed to base VRG's remuneration on the percentage of rental payments received does not demonstrate an intention to hold the tenant's rent as payment for VRG's services. It is merely a payment schedule.
In concluding the agreement for long-term payment of commissions out of the monthly base rent was no more than a payment schedule and did not reflect the parties' intention to look to the rents as the source for VRG's remaining commissions after exhausting the $250,000 credit, we think the trial judge erred. We recognize that findings by a trial judge in a nonjury trial are, ordinarily, binding on appeal when supported by adequate, substantial, and credible evidence. Rova Farms Resort, Inc. v. Investors Ins. Co. of America, 65 N.J. 474, 484, 323 A.2d 495 (1974). As we observed, however, in Pioneer Nat'l Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 338, 382 A.2d 933 (App.Div.), aff'd, 78 N.J. 320, 394 A.2d 360 (1978):
if we are thoroughly satisfied that the findings and the ultimate conclusions are clearly mistaken and so plainly unwarranted that the interests of justice demand intervention and correction, we should appraise the record as if we were deciding the matter at inception and make our own findings and conclusions. This feeling of "wrongness" arises where our review of the proofs leaves us with the definite conviction that the judge went so wide of the mark that a mistake must have been made.
We think the trial judge here went "so wide of the mark that a mistake must have been made."
The concept of an equitable lien arises from the firmly ingrained maxim that "equity regards as done that which ought to be done...." Hadley v. Passaic Nat'l Bank and Trust Co., 113 N.J. Eq. 548, 551, 168 A. 38 (Ch. 1933). Such a lien can be imposed on property where there exists an agreement in which:
the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for *455 a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security....
[4 Pomeroy's Equity Jurisprudence, § 1235 at 696 (5th ed. 1941)].
It is "a right of a special nature in a fund and constitutes a charge or encumbrance upon the fund.... Where one promises to pay for services rendered out of a fund created in whole or in part by the efforts of the promisee, a lien in favor of the promisee will attach to the fund when it comes into existence." In re Hoffman, 63 N.J. 69, 77, 304 A.2d 721 (1973). See also Hadley, 113 N.J. Eq. at 551, 168 A. 38. The form, moreover, which an agreement takes in order to create an equitable lien is not dispositive, for equity looks at the intent and purpose. "If an intent to give, charge or pledge property, real or personal, as a security for an obligation appears, and the property or thing intended to be given, charged or pledged is sufficiently described or identified, then the equitable lien... will follow as of course." Rutherford Nat'l Bank v. H.R. Bogle & Co., 114 N.J. Eq. 571, 574, 169 A. 180 (Ch. 1933). See In re Loring, 62 N.J. 336, 340-41, 301 A.2d 721 (1973) (assertion of attorney of an equitable lien for a fee claim out of sale proceeds of house); Cohen v. Estate of Sheridan, 218 N.J. Super. 565, 570, 528 A.2d 101 (Ch.Div. 1987) (real estate brokers found to have equitable lien for their commissions on proceeds of sale due vendor at closing); Wilson v. Seeber, 72 N.J. Eq. 523, 535-36, 66 A. 909 (Ch. 1907) (an agreement by an attorney whereby he was to receive one-third of the proceeds of shares of stock to be recovered in an action to undo a shares transaction sufficient to establish intention of the parties for the attorney to receive one-third of the proceeds of the action and thus to form a basis for an equitable lien upon those proceeds). Thus, "[w]here one promises to pay for services rendered out of a fund created in whole or in part by the efforts of the promisee, a lien in favor of the promisee will attach to the fund when it comes into existence." In re Hoffman, 63 N.J. at 77, 304 A.2d 721. See also Camden Safe Deposit and Trust Co. v. Atlantic Properties, Inc., 10 N.J. Misc. 59, 59-60, 157 A. 838 (Ch. 1931) (lease *456 provision that commissions due for procuring tenants would be paid from rental monies was imposed upon receiver in bankruptcy).
Such a lien, moreover, is "enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrances with notice." 4 Pomeroy's Equity Jurisprudence, § 1235 at 696. Indeed, it has been said that such notice need only be constructive or imputed notice. See Colegrove v. Behrle, 63 N.J. Super. 356, 369, 164 A.2d 620 (App.Div. 1960). We need not express an agreement or disagreement with this since it is clear GKN received direct notice of VRG's claim as well as a copy of the exclusive agreement, paragraph four of which plainly provides a basis for a lien upon rental income. Accord Bacharach v. Mitnick, 121 N.J.L. 401, 404, 3 A.2d 92 (Sup.Ct. 1938) (assignee of a lease required to pay real estate commissions that assignor agreed to pay from the rents received or, in the event of sale, from the sale proceeds).
We think the trial court's construction of paragraph four fails entirely to "consider what was written, in the entire context of the circumstances under which it was written, and to accord the language a rational meaning in keeping with the expressed general purpose." Jacobs v. Great Pac. Century Corp., 104 N.J. 580, 586, 518 A.2d 223 (1986). It is uncontroverted that VRG desired full payment upon the opening of the shopping center but that Perlman wished to pay part in advance with the remainder coming from the "stream" of rental income. Given these circumstances there can be no question but that it was the rental monies that both parties intended to be the source of payment once the advance was exhausted. This is particularly evidenced by the structure of the initial $250,000 payment, i.e. to be applied against each month's rental income as credit against VRG's entitlement to 6% of that income. We think it plain the parties' intent, particularly Perlman's, was to limit VRG's right to receive its commissions to the stream of rental income from the property. Thus, the negotiated removal from *457 the agreement of the provision that would have given VRG a right to full payment in the event of sale from the sale proceeds. Simply put, VRG was responsible for procuring the rental income from the shopping center and Perlman negotiated and agreed to a pledge of that income as a source of payments of VRG's commissions.
Moreover, although Nussbaum disputed Backos' testimony that when he told her not to attend the closing she agreed but warned that VRG would look to GKN for its commissions in the event they were to be paid at closing, it is uncontroverted that Nussbaum and GKN were on notice of the commissions obligation. Not only was the exclusive agency to lease agreement with the critical paragraph four sent to GKN at its request, but uncontroverted is Backos' testimony that in February when she met with Nussbaum and Gladstone she advised them of the "obligation over the terms of [the] leases ... and that that obligation rode with the leases...." and that if the commission obligation was not satisfied at closing, it would "impact the cash flow that [GKN is] buying."
Under these circumstances, plaintiff was entitled to an equitable lien upon the rental income from the leases it procured and pursuant to paragraph four of its agreement with Golden Reef. We see no inequity in imposing the lien upon the rental income of GKN notwithstanding it was not the promisor. It had actual notice of VRG's claim that the commissions were tied to the rental income and that if not satisfied at closing, VRG would look to that income for payment. Although not so obligated, GKN could have insisted that the debt be paid by Golden Reef out of the closing proceeds before accepting title. It chose, instead, to avoid any potential dispute at the time of closing in, apparently, reliance upon its indemnification agreement with Golden Reef in the event its promise to pay was not honored.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] The original complaint alleged, alternatively, breach of lease agreement and unjust enrichment against various defendants. VRG's claims against Golden Reef and Perlman Enterprises have been stayed by virtue of a Chapter 11 Bankruptcy petition filed by those defendants. The nonjury trial from which VRG appeals proceeded solely on the equitable lien claim asserted against GKN as to the rental income of the shopping center. We do not, thus, address any issue of breach of lease agreement or unjust enrichment.