American Pin Co. *v.* Wright.

THE AMERICAN PIN COMPANY

*v.*

ALFRED A. WRIGHT et al.

[Filed November 17th, 1900.]

Agreement under seal of a debtor that when he shall effect a sale of his house the proceeds shall be immediately devoted to payment of a certain indebtedness, does not create a lien on the land.

On demurrer to bill.

*Mr. Edwin B. Goodell* and *Mr. Frank P. McDermott,* for the demurrants.

*Mr. Frank E. Bradner,* for the complainant.

PITNEY, V. C.

The facts set out in the bill, stated in the order of time, are as follows:

On or before the 9th of February, 1895, the defendant Wright was indebted to the complainant in the sum of about five thousand dollars, and at that time was the owner of a dwelling-house and lot of land described in the bill; by deed dated February 1st, 1895, and acknowledged on the 9th and recorded on the 11th of February, Wright conveyed the same to the defendant Ames, who, by deed of the same date, acknowledged and recorded at the same time, conveyed the same to the defendant, the wife of Wright, and said conveyances were without any consideration whatever; subsequently, on the 1st of July, 1896, Wright and wife joined in a mortgage of the premises to the defendant Ninde to secure the sum of $10,000; the amount of $10,000 was not due at that time or at any time from Wright to Ninde, but, if anything, a much less sum was due; on the 15th of October, 1896, Wright executed an agreement, in writing.

under seal, with the complainant, which admitted that Wright was indebted to the complainant in the sum of $5,024.87, and after providing for a variety of matters not necessary for present purposes to be stated, the agreement contains this eighth and last clause:

"The second party further agrees that in the event that said Wright should succeed in negotiating his 'trolley deal,' so called, in Montclair, N. J., or in selling his house in Montclair, the entire proceeds of either or both of said deals shall be immediately devoted to the payment of the indebtedness set forth in paragraph one in equal amounts to each individual composing the first party."

The bill contains a general allegation that the conveyance to the wife was made for the purpose of defrauding the complainant as his creditor, and that it, as well as the mortgage to Ninde, was concealed from the complainant when the agreement was entered into, and that the amount stated in the agreement is still due the complainant from Wright. The prayer is that the settlement by Wright on his wife may be declared void as against the complainant and other creditors of Wright who were parties to the agreement above mentioned.

The right of the complainant to relief depends on its establishing two propositions—first, that the settlement of February, 1895, by Wright upon his wife was fraudulent and void as against the complainant, and second, that the clause of the agreement of October, 1896, above set forth, gave it an equitable mortgage upon the premises in question.

The facts stated show that the settlement of February, 1895, by Wright upon his wife, was fraudulent and void against the then-existing creditors, of whom the complainant was one, and it is probable that it would be void not only against a judgment creditor, but under *27 Eliz. c. 4*, sections 13 and 14 of our statute of frauds (*Gen. Stat. p. 1604*), against any creditor who obtained a lien thereon by any lawful means, and included in that class would be a grantee or mortgagee for value. It is upon that principle that the case of *Pillsbury* v. *Kingon, 6 Stew. Eq. 287*, was decided, where it was held that an assignee for the benefit of creditors could file a bill to set aside a deed in fraud of creditors made by the assignor.

American Pin Co. v. Wright.

So that if the clause in the agreement of October, 1896, above set forth, did create a lien or equitable charge upon the lands in question, the bill, as I now think, must be held to make out a case for equitable interposition, and the demurrer be overruled.

It will be observed that the clause in question does not make any direct appropriation of the land, but only of the proceeds of the sale, and such proceeds as shall result from a supposed effort of the ·debtor, Wright, to negotiate and complete the sale, if Wright "should succeed in selling his house in Montclair." It is, then, in effect, a promise to devote the proceeds of the sale of his house, *when he shall effect it,* to the payment of complainant's debt. Is that language sufficient to create a lien upon the house and lot itself as such?

Now, this question must be determined not by what the court may suppose the parties intended to accomplish, but by what is the meaning of the words used. The effect of the language itself must determine the question. And bearing that rule of construction in mind, I am unable to come to the conclusion that any charge was created upon the land. It amounted to no more than a promise, under seal, to pay to the complainant and the other creditors mentioned in the agreement of October, 1896, the proceeds of the sale of the premises *when it should be effected.* It gave no right to the creditors to effect a sale, or to compel a sale. That office and duty was left entirely optional with the debtor. He did not even agree that he would proceed and effect a sale at some price. The obligation to pay was contingent upon his own free will. It arose only when he should have sold.

I have been unable to find any authority which has gone so far as to hold an agreement of this kind to amount to a charge. It is rather to be ranged with that class of cases which amount to no more than a promise to pay out of a fund when received. Of such contracts the editor of *White & Tudor's. Leading Cases in Equity (4th Am. ed.)* (at *p. 1644*), uses this language:

"To constitute an assignment, there must be an actual or constructive appropriation which confers a present right on the assignee, although the circumstances may not admit of its immediate exercise. A covenant to pay a debt with the proceeds of goods when sold, or out of an outstanding

demand when collected, will not operate as an assignment, because it implies that the covenantor is to retain a control over the fund, and that more remains to be done on his part to make the transfer effectual."

The authorities cited by him at the page above quoted support this statement. And see *Lanigan's Administrator* v. *Bradley & Currier Co., 5 Dick. Ch. Rep. 201* (at bottom of *p. 205*). There is nothing in the clause of the contract above cited which would prevent the defendant Wright, on a sale of his house, from actually receiving the money himself from the purchaser. See generally on this subject *3 Pom. Eq. Jur.* §§ *1235-1237*.

The distinction, when dealing with pure personalty, is between a promise to pay out of the fund after it comes to the hands of the promisor and a direction to the present holder of the fund to pay it or a part of it to another person. The first is a mere promise; the latter is an assignment. In regard to land the distinction is between a mere promise to pay out of the rents or proceeds of sale when received, and a present agreement to devote the land or its rents to the payment of the debt.

The older adjudged cases on this topic are collected by Mr. Powell in *3 Powell on Mortgages (Boston ed., 1828)*, *ch. 23 p. 1049, a, b and c.*

In *Legard* v. *Hodges, 1 Ves. Jr. 477,* the owner of land covenanted with the trustees of his marriage settlement to raise £10,000 by setting apart and paying to them one-third part of the clear annual profits of his estates in England and the West Indies. Lord Thurlow said: "Excluding that case, none of the rest go to establish a proposition in contradiction to this maxim, which I take to be universal, that wherever persons agree concerning any particular subject, that in a court of equity as against the party himself, and any claiming under him voluntarily or with notice, raises a trust. These persons have so agreed, and therefore this is a pure trust estate, and they must be declared trustees for one-third of the clear annual profits, and must account from the time of taking possession, having all just allowances." Here the covenantor, by his deed, gave an equitable right to his trustees to intervene and seize the rents as they accrued. It was a right to invoke the aid of a court of

equity to take the rents before they reached the hands of the landlord.

*Suart* v. *Toulmin,* reported only by Mr. Powell, was this: Hall, a testator, by his will, charged his real estate with the payment of his debts, and gave his widow a life interest in it. The heir-at-law and widow joined in a promissory note for money borrowed, in which was inserted a clause "out of the estate of the late William Hall." The vice-chancellor (Leech) is reported to have said: "The question here is merely one of construction. Did the widow and children mean this instrument to create merely a personal obligation, or to operate as an agreement to affect the estate? They promise to pay *out of the estate of the deceased father,* that is, out of all the estate; and there being now no personalty, this instrument must be held to be an agreement to charge upon the real estate the money advanced."

The difference between that case and the one under consideration is that there the promise was absolute—to pay out of the estate; while here it is conditional upon the event of the promisor selling his house, unaccompanied by any promise or covenant to make such sale at any time.

*Hodgson's Case, 1 Glyn & J. 13,* illustrates this distinction. There the language was:

"As I am entitled to the benefit of any surplus which may remain of the produce of the sale of the premises assigned by Edward Gifford to you by indenture dated, &c., I authorize you to act and sell and pay yourself, out of that surplus, the sum of £250, which is due from me to you, with lawful interest for the same from the date hereof, for cash advanced to me this day on account of my interest in the said premises."

And it was held to create an equitable mortgage because it gave the creditor authority to proceed and act for himself without further intervention by or aid of the covenantor.

The case of *Christmas* v. *Russell, 14 Wall. 69,* although it related to pure personalty, is instructive. Counsel in arguing (at *p. 75*) quotes Lord Hardwicke as saying (*Ridgway's Cases 194*) : "If a debtor promises to pay his creditor out of the money to be recovered in a certain suit, and on the faith of this promise the creditor forbears to sue him, this creates no specific lien on the money recovered." And Mr. Justice Swayne (at *p. 84*) sums

up the law as follows: "An agreement to pay out of a particular fund, however clear in its terms, is not an equitable assignment; a covenant in the most solemn form has no greater effect. The phraseology employed is not material, provided the intent to transfer is manifested. Such an intent and its execution are indispensable. The assignor must not retain any control over the fund—any authority to collect, or any power of revocation. If he do, it is fatal to the claim of the assignee. The transfer must be of such a character that the fund-holder can safely pay, and is compellable to do so, though forbidden by the assignor. Where the transfer is of the character described, the fund-holder is bound from the time of notice. A bill of exchange or check is not an equitable assignment, *pro tanto,* of the funds of the drawer in the hands of the drawee. But an order to pay out of a specified fund has always been held to be a valid assignment in equity and to fulfill all the requirements of the law. These views are fatal to the claim asserted by the complainants in behalf of the sureties on the bond."

For these reasons I conclude that the covenant in question did not give the complainant a lien upon the land itself, and that the demurrer must be sustained and the bill dismissed, upon the usual terms.