641 A.2d 519

VRG CORPORATION, PLAINTIFF–RESPONDENT, v. GKN REALTY CORP. AND HEATHER CROFT ASSOCIATES, L.P., DEFENDANTS–APPELLANTS, AND GOLDEN REEF CORPORATION, PERLMAN ENTERPRISES, INC., AND TILTON SQUARE DEVELOPMENT ASSOCIATES, DEFENDANTS.

Argued October 26, 1993—Decided May 18, 1994.

540

541

*Anne C. Singer* argued the cause for appellants (*Blank, Rome, Comisky & McCauley,* attorneys; *Ms. Singer* and *Peter J. Boyer,* of counsel).

*Francis P. Maneri* argued the cause for respondent (*Jubanyik, Varbalow, Tedesco, Shaw & Shaffer,* attorneys).

*Steven S. Radin* argued the cause for *amicus curiae* International Council of Shopping Centers (*Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross,* attorneys; *Mr. Radin* and *Jeffrey H. Newman,* of counsel; *Anthony J. Monaco,* on the brief).

*Arthur M. Greenbaum* argued the cause for *amicus curiae* New Jersey Association of Realtors (*Greenbaum, Rowe, Smith, Ravin & Davis,* attorneys; *Mr. Greenbaum* and *Bruce D. Greenberg,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

This case arises out of the attempts of a commercial-leasing broker to recover commissions for procuring tenants in a shopping center. The legal issue presented is whether the broker, which earned commissions for obtaining long-term tenants for the shopping-center owner, can impose an equitable lien on the rental income derived from those tenants after the sale of the shopping

center to a new owner who, although aware of the broker's claim, had not agreed to be responsible for such commissions.

When the current owner refused to pay the broker's commissions, the broker instituted this suit, seeking a declaration imposing an equitable lien against the shopping center's rental income. The trial court determined that the broker was not entitled to an equitable lien and dismissed the complaint. On appeal, the Appellate Division reversed that judgment. 261 *N.J.Super.* 447, 619 *A.*2d 251 (1993). This Court granted certification. 133 *N.J.* 443, 627 *A.*2d 1147 (1993). We now reverse and reinstate the judgment of the trial court.

I

Plaintiff VRG Corporation ("VRG") is a real-estate broker specializing in obtaining long-term tenants for commercial property. On October 24, 1985, VRG entered into an Exclusive Agency to Lease Agreement ("agreement") with Golden Reef Corporation ("Golden Reef"), a New Jersey corporation, and Perlman Enterprises, Inc., a Florida corporation authorized to do business in New Jersey, to assist in the development of the Heather Croft Square Shopping Center ("shopping center") in the town of Northfield, New Jersey. The agreement granted VRG an exclusive agency to procure tenants for the shopping center.

Catherine Backos, a licensed New Jersey real-estate broker and a vice-president of VRG, negotiated the agreement with Golden Reef. Initially, Backos attempted to negotiate full payment on a discounted basis of all the commissions due at the time the shopping center opened. However, Stuart Perlman, the principal of Golden Reef, refused.

Paragraphs four and five of the agreement discuss the broker's compensation for procuring tenants. Paragraph four sets VRG's commission at six percent of each monthly rental payment received from the tenants that it procured. Paragraph five provided for the payment of $250,000.00 as an advance on commissions, which was then to be credited against monthly rents at the rate of

six percent. VRG also agreed to remove a provision from the original draft agreement that would ensure an accelerated payment of all commissions due from the proceeds of any sale of the property. In addition, the agreement bound the successors and assigns of the parties.

VRG obtained long-term tenants for the shopping center, which opened in December 1986. At that time, Golden Reef paid VRG the $250,000.00 advance payment under paragraph five of the agreement. VRG calculated that the $250,000.00 advance, credited against the six percent commissions from the monthly rentals, would have been exhausted and payment based on the monthly rents would have commenced in March 1992.

Golden Reef, on February 22, 1989, entered into a contract to sell the shopping center to defendant GKN Realty Corporation ("GKN") for $9,800,000.00. That contract was later assigned by GKN to Heather Croft on May 24, 1989 (hereinafter GKN and Heather Croft are collectively referred to as "GKN").

Backos testified that when she learned of the impending sale, she advised GKN's real-estate counsel, Donna Sternberg, that "we had an ongoing commission contract with Golden Reef Corporation and that if the property were being sold, I wanted her to be aware that there was an ongoing obligation by the landlord to pay a six percent commission for these leases that were in that center." Sternberg notified David Nussbaum, a vice-president of GKN, of her conversation with Backos. Subsequently, Nussbaum and Roger Gladstone, another vice president of GKN, met with Backos and Val Galasso, the President of VRG. Backos testified that she advised Nussbaum of the "ongoing obligation by the landlord to pay ... the six percent commission on each of the leases that [VRG] had obtained."

Following the discussion with Backos and Perlman, Nussbaum testified that GKN amended the original contract of sale with Golden Reef. Although the initial contract made no reference to any potential liability for commissions owed to VRG, the amended contract included an indemnification provision, which stated that

Golden Reef was to be responsible for payment of the broker's commissions.

Nussbaum, who negotiated the purchase of the shopping center for GKN, believed that the commissions would be paid at the closing by Golden Reef. Backos herself testified that she had "expected to be paid off" the outstanding $309,388.96 in commissions by Golden Reef at the settlement and that she had "looked to Golden Reef as the primary party responsible for paying these commissions." Backos acknowledged at trial that Nussbaum never told her that GKN would pay the commissions. In response to a letter dated June 12, 1989, in which Backos stated "she expected to be paid in full at the closing," Perlman advised Backos not to attend the closing. He further stated that he would pay VRG its commission the day after the closing. After her discussion with Perlman, Backos telephoned Nussbaum who also advised her not to attend the closing because it might "fall apart" if she attended and demanded payment. Although disputed by Nussbaum, Backos testified that she advised him that if VRG's commission obligation was not satisfied at the closing, VRG would look to GKN for the commissions. At the closing, Golden Reef assigned to GKN all of its right, title, and interest in the leases procured by VRG.

Golden Reef never made payment to VRG. On July 11, 1989, VRG filed a complaint against Golden Reef and GKN to recover its commissions. Golden Reef then filed a Chapter 11 bankruptcy petition, effectively foreclosing VRG's claim for commissions against it.

## II

Although VRG presents its claim in the contemporary setting of brokerage services rendered in connection with the development, completion and management of a modern-day shopping center, the remedy that it seeks—the equitable lien—has its roots in the traditions of equity. The equitable principles that gave rise to the remedy continue to shape it.

An equitable lien is "a right of special nature in a fund and constitutes a charge or encumbrance upon the fund." *In re Hoffman,* 63 *N.J.* 69, 77, 304 *A.2d* 721 (1973). Generally, "[t]he theory of equitable liens has its ultimate foundation . . . in contracts, express or implied, which either deal with or in some manner relate to specific property, such as a tract of land, particular chattels or securities, a certain fund, and the like." 4 John N. Pomeroy, *A Treatise on Equity Jurisprudence* § 1234, at 695 (Spencer W. Symons ed., 5th ed. 1941); *see Bergen Co. Welf. Bd. v. Gross,* 96 *N.J.Super.* 472, 478–80, 233 *A.2d* 389 (Ch.Div. 1967). An equitable lien "may be created by express executory contracts relating to specific property then existing, or property to be afterward acquired." *Temple v. Clinton Trust Co.,* 1 *N.J.* 219, 226, 62 *A.2d* 690 (1948); *see also* 53 *C.J.S. Liens* § 6, at 464 (1987) ("As a general rule, any express executory contract whereby one party clearly indicates an intention to charge or appropriate some particular property, real or personal, therein described or identified, as security for a debt or other obligation, or whereby one party promises to assign, convey, or transfer the property as security for such a debt or obligation, creates an equitable lien on the property so indicated."). It may also be founded on "the dictates of equity and conscience, as where a contract of reimbursement could be implied at law and enforced by the action of *assumpsit,* or in certain cases where contribution or reimbursement is enforceable in equity, including those involving fraud and mistake." *Temple, supra,* 1 *N.J.* at 226, 62 *A.2d* 690. "The whole doctrine of equitable liens or mortgages is founded upon that cardinal maxim of equity which regards as done that which has been agreed to be, and ought to have been, done." *Rutherford Nat'l Bank v. H.R. Bogle Co.,* 114 *N.J.Eq.* 571, 169 *A.* 180 (Ch.1933); *see Hadley v. Passaic Nat'l Bank,* 113 *N.J.Eq.* 548, 551, 168 *A.* 38 (Ch.1933).

Traditionally, New Jersey courts held that a mere promise to pay a debt out of a designated fund does not give rise to an equitable lien on that fund unless the promisor parts with control of the fund. *Metropolitan Life Ins. Co. v. Poliakoff,* 123 *N.J.Eq.*

524, 529, 198 *A.* 852 (Ch.1938); *Myers v. Forest Hill Gardens Co.,* 103 *N.J.Eq.* 1, 141 *A.* 808 (Ch.1928), *aff'd,* 105 *N.J.Eq.* 584, 147 *A.* 911 (E. & A. 1929); *American Pin Co. v. Wright,* 60 *N.J.Eq.* 147, 46 *A.* 215 (Ch.1900), *aff'd,* 85 *N.J.Eq.* 219, 98 *A.* 1084 (E. & A. 1901). Our courts today, however, recognize that a contract to pay for services out of a designated fund gives the party performing the services an equitable lien on that fund when it comes into existence. "Where one promises to pay for services rendered out of a fund created in whole or in part by the efforts of the promisee, a lien in favor of the promisee will attach to the fund when it comes into existence." *Hoffman, supra,* 63 *N.J.* at 77, 304 *A.*2d 721; *see Camden Safe Deposit and Trust Co. v. Atlantic Properties, Inc.,* 10 *N.J. Misc.* 59, 59–60, 157 *A.* 838 (Ch.1931). Nevertheless, the language purporting to express such an understanding must itself be clear. *See Wilson v. Seeber,* 72 *N.J.Eq.* 523, 66 *A.* 909 (Ch.1907).

■■■ Reflecting the notion that the primary basis for the imposition of an equitable lien is contractual, such a lien may arise through an assignment. Thus, where a contract itself creates the basis for a lien, a court may impose an equitable lien if the contract is assigned with notice of that lien. *See McCann v. Biss,* 65 *N.J.* 301, 313, 322 *A.*2d 161 (1974); *Masten Realty Co. v. James,* 125 *N.J.L.* 529, 530, 16 *A.*2d 464 (S.Ct.1940).

Further, it is generally recognized that the intent of the parties controls in the creation of an equitable lien.

[E]quity looks at the final intent and purpose rather than at the form. If an intent to give, charge, or pledge property, real or personal, as security for an obligation appears, and the property or thing intended to be given, charged, or pledged is sufficiently described or identified, then the equitable lien or mortgage will follow as of course.

[*Rutherford Nat'l Bank, supra,* 114 *N.J.Eq.* at 574, 169 *A.* 180 (citations omitted).]

Hence, "[w]hile the form which an agreement shall take in order to create an equitable lien or mortgage is quite immaterial, . . . [discerning] the final intent and purpose" is critical in equity. *Id.* at 571, 169 *A.* 180; *see also Eisenhardt v. Schmidt,* 27 *N.J.Super.*

76, 98 A.2d 698 (Ch.Div.1953) (noting that important element in whether to impose equitable lien is not form of agreement, but parties' intentions).

■ Additionally, unjust enrichment may constitute a ground for imposing an equitable lien. *See Callano v. Oakwood Park Homes Corp.*, 91 *N.J.Super.* 105, 108, 219 *A.*2d 332 (App.Div.1966). An equitable lien may be created "[w]here property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched." *Restatement of Restitution* § 161 (1937); *see Copeland v. Clafin*, 12 *N.J.Super.* 10, 14, 78 *A.*2d 827 (App.Div.), *certif. denied*, 7 *N.J.* 347, 81 *A.*2d 522 (1957).

### III

### A.

■ We consider initially whether under the circumstances an equitable lien arises based on the express or implied intention of the parties. Courts use a number of interpretive devices to discover the intention of parties to a contract. " 'These include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct.' " *Jacobs v. Great Pacific Century Corp.*, 104 *N.J.* 580, 582, 518 *A.*2d 223 (1986) (quoting *Kearny PBA Local No. 21 v. Town of Kearny*, 81 *N.J.* 208, 221, 405 *A.*2d 393 (1979)).

The trial court held that "there is no equitable lien enforceable against GKN" and entered final judgment dismissing VRG's claim. The court concluded:

> The law is clear; [in order to create an equitable lien] there must be some manifestation of intention to have some particular property subjected to . the payment of a debt. However, in this case, I find no intention by GKN or Golden Reef that the rental payments serve as security for the payment of VRG's rental commissions.

The Appellate Division disagreed, believing that Golden Reef, as well as VRG, had the intent necessary to create the equitable lien:

It is uncontroverted that VRG desired full payment upon the opening of the shopping center but that Perlman wished to pay part in advance with the remainder coming from the "stream" of rental income. Given these circumstances there can be no question but that it was the rental monies that both parties intended to be the source of payment once the advance was exhausted.

[261 *N.J.Super.* at 456, 619 *A.2d* 251.]

The contract itself does not express the intent found by the Appellate Division. VRG and GKN did not explicitly agree that the broker's commission would be paid out of the rental income generated by tenants of the shopping mall. Paragraph two of the agreement states that "[i]n consideration of the services to be rendered by Broker, Owner grants to VRG the exclusive agency to procure tenants for the Center." "As compensation for Broker's acceptance of this agency and its diligent efforts to procure tenants for the Center," paragraph four provides,

Owner agrees that Broker shall be entitled to a commission for each tenant who enters into a lease for space in the Center during the term of this Agreement equal to six (6%) percent of each monthly gross base rental payment under the initial term of such lease.

The terms of the agreement thus specify only that VRG's compensation is both contingent on and measured by the rental income received by Golden Reef from the leases that VRG procured.

That Perlman did not specifically express the intent to pay commissions from the rental proceeds as such is not necessarily fatal to the creation of an equitable lien. *See, e.g., Manfredi v. Manfredi,* 12 *N.J.Super.* 207, 211, 79 *A.*2d 331 (Ch.1951) (noting that intent of parties, not words of agreement, is important to create equitable lien). An "overview of all of the terms" (*Jacobs, supra,* 104 *N.J.* at 582, 518 *A.*2d 223) of the contract, including both its structure and cognate provisions, is relevant in determining whether the parties intended that rental incomes would constitute security for the payment of VRG's commissions.

The Appellate Division found that the contract as a whole embraced such an understanding, which, it stated,

is particularly evidenced by the structure of the initial $250,000 payment, i.e. to be applied against each month's rental income as credit against VRG's entitlement to 6% of that income. We think it plain the parties' intent, particularly Perlman's, was to limit VRG's right to receive its commissions to the stream of rental income from the property.... Simply put, VRG was responsible for procuring the rental income from the shopping center and Perlman negotiated and agreed to a pledge of that income as a source of payments of VRG's commissions.

[261 *N.J.Super.* at 456–57, 619 *A*.2d 251.]

The contract, however, does not import an agreement "to a pledge of [the rental] income as a source of payments of VRG's commissions." Paragraph 4 of the agreement provides that VRG's "commission for each tenant" is "equal to six (6%) percent" of the rent. Further, the commission is to be payable on a "monthly basis ... by [Golden Reef] to [VRG] within ten (10) days after receipt by [Golden Reef] of the subject monthly rental payment." Thus, the contract language makes clear that the rents are used only as a measure of the amount and timing of commission payments, not as their source or security. *Cf. Wilson, supra,* 72 *N.J.Eq.* at 531, 66 *A.* 909 ("[T]he language is clear. Schauble [client] agreed to pay Wilson [attorney] one-third part of whatever money shall be paid to or received by Schuable by way of compromise, & c. The language is not to pay a sum equal to one-third, but to pay the one-third part."). Hence, the trial court correctly determined that "the parties agreed on a formula for calculating the compensation due VRG for its services" and that the provision for compensation in the contract constituted "a simple calculation" and "merely a payment schedule."

Further, "the circumstances leading up to [and surrounding] the formation of the contract" (*Jacobs, supra,* 104 *N.J.* at 582, 518 *A*.2d 223), do not establish a mutual intent that the rents would be pledged to secure the payment of VRG's commissions. In *Hoffman, supra,* 63 *N.J.* at 69, 304 *A*.2d 721, this Court imposed an equitable lien for an accountant who had prepared amended tax returns for a decedent based on a promise that the accountant's fee would be paid out of the refund. The decedent's estate was insolvent and the accountant was one of numerous general credi-

tors. The Court imposed an equitable lien, finding that the ability of general creditors to derive the entire benefit of the fund created by the accountant's efforts would be unfair. *Id.* at 78, 304 *A.*2d 721. As the Court noted, "Where one promises to pay for services rendered out of a fund created in whole or in part by the efforts of the promisee, a lien in favor of the promisee will attach to the fund when it comes into existence." *Id.* at 77, 304 *A.*2d 721. *Hoffman* is distinguishable from this case, however, because in *Hoffman,* "[n]one of the parties ... disputed that Robert Hoffman [the decedent] intended to pay the fee of Brooks [the accountant] from the amount received through the tax refund." *Id.* at 78, 304 *A.*2d 721. Here, the point is disputed, and the underlying facts do not establish that the parties intended to pay Backos' fee from the rental income.

Perlman, according to Backos, referred to the long-term agreement as an "annuity." Backos described her future commissions based on future rents as "a six percent income stream from [the] property." However, those characterizations do not import the intent or understanding that the rents were to be set aside or dedicated as security for future payments. Rather, as stated by the trial court: "Just because the parties agreed to base VRG's remuneration on the percentage of rental payments received does not demonstrate an intention to hold the tenant's rent as payment for VRG's services."

Focusing on the surrounding circumstances, the Appellate Division also believed that "the negotiated removal from the agreement of the provision that would have given VRG a right to full payment in the event of sale from the sale proceeds" was evidence of an intent to dedicate future rents. 261 *N.J.Super.* at 456–57, 619 *A.*2d 251. Although Backos usually tried to obtain full payment "up front," she nevertheless agreed to Perlman's demand that $250,000.00 be paid as an initial payment to be credited against monthly rents for her commission. However, contrary to any understanding that future commission payments would be secured by future rents, she conceded and acknowledged that,

because the shopping center could be sold, it was "risky" to accept payment over time.

In addition, "the interpretation placed on the [agreement] by the parties' conduct" (*Jacobs, supra,* 104 *N.J.* at 582, 518 *A.*2d 223) does not, under the circumstances, establish an implied agreement that the rents were to be pledged or dedicated as security for payment of commissions. *See* 53 *C.J.S. Liens* § 5, at 462 (1987) (noting that an equitable lien may be created without an agreement based on "considerations of right and justice" that arise from "the conduct and dealings of the parties"). Any such putative understanding is negated by the fact that VRG did not seek to enforce such an understanding when it learned of the sale of the shopping center. Rather, its actions were consistent with the understanding that its commissions were unsecured, their payment was the obligation of Golden Reef and, accordingly, it sought to be paid out of the closing proceeds, not out of dedicated future rents. Thus, as put by the trial court; "[A]ll along VRG looked to Golden Reef for payment, even after closing. VRG was under the impression that all commissions were to be paid at the closing by Golden Reef."

Further, the record does not support a conclusion that "custom or usage" (*Jacobs, supra,* 104 *N.J.* at 582, 518 *A.*2d 223) establishes a mutual intent to dedicate the shopping center's rental incomes as security for the payment of the broker's commissions. Under some circumstances, it may be customary for brokers to be paid their commissions out of the fund that their efforts created. *See Ellsworth Dobbs, Inc. v. Johnson,* 50 *N.J.* 528, 552, 236 *A.*2d 843 (1967) (noting that fundamental intendment of owner and broker is that broker will earn commission out of sale proceeds); *In re L.D. Patella Constr. Corp.,* 114 *B.R.* 53 (D.N.J.1990) ("It is generally the intention of the parties when a broker is retained that he will be paid from the proceeds of the sale."). In this vein, some courts have emphasized the reasonable expectations of the parties. *See, e.g., Cohen v. Estate of Sheridan,* 218 *N.J.Super.* 565, 566–67, 528 *A.*2d 101 (Ch.Div.1987) (determining that brokers

that procured buyer of real property had equitable lien for their commissions on sale proceeds owed to seller at closing).

There is, however, no evidence of a custom, practice, or usage reflected in the record or arguments of the parties that commercial real-estate brokers are entitled to encumber rental incomes generated by long-term tenants in shopping mall developments as security for the payment of their commissions. Bernard H. Goldstein, *A Documentary Guide to Commercial Leasing* 28 (1990 Supp.). Rather, the expectation of the parties in this case was that the commissions would be paid over time according to a schedule geared to the receipt of rents and, further, that on the sale of the property, commissions would be paid in a single, lump sum from the proceeds of the closing.

We note, also, that no argument is made by VRG, nor is there any suggestion to be gleaned from the circumstances surrounding the formation of the contract, that the agreement to pay commissions calculated and payable on the basis of future rents was unconscionable or a contract of adhesion. *See, e.g., Rudbart v. Water Supply Com'n,* 127 *N.J.* 344, 605 *A.*2d 681 (1992). Backos acknowledged that she made a "business judgment" at that time to take the risk of removing the acceleration clause from the agreement. "In short," stated the trial court, "VRG made a business decision to accept payment over a period of time." Thus, the record discloses open and level bargaining by both parties. In the words of the trial court: "[T]he parties were free to negotiate any basis for payment." And so, a court would be "hard pressed" to justify imposing an equitable lien based on either an express or implied contract theory. *See post* at 568, 641 *A.*2d at 534.

### B.

We also conclude that there is no basis for this Court to impose an equitable lien on the rental incomes grounded in the doctrine of unjust enrichment. Unjust enrichment may sometimes be a factor in creating an equitable lien. *See Hoffman, supra,* 63 *N.J.* at 77, 304 *A.*2d 721 ("Where one promises to pay

for services rendered out of a fund created in whole or in part by the efforts of the promisee, a lien in favor of the promisee will attach to the fund when it comes into existence."); *Donnelly v. Capodici*, 227 *N.J.Super.* 310, 313, 547 *A.*2d 329 (Ch.Div.1987) (noting that because "[e]quity should not permit unjust enrichment," an equitable lien should be imposed on behalf of seller for enhanced value of real property improvements in partition action); *Restatement of Restitution* § 161 (1937); *see, e.g., Small v. Badenhop*, 67 *Haw.* 626, 701 *P.*2d 647 (1985); *Pierson v. Jones*, 102 *Idaho* 82, 625 *P.*2d 1085 (1981); *Lewis v. Wisconsin Banking Commission*, 225 *Wis.* 606, 275 *N.W.* 429 (1937). To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust. *Associates Commercial Corp. v. Wallia*, 211 *N.J.Super.* 231, 243, 511 *A.*2d 709 (App.Div.1986); *Callano, supra*, 91 *N.J.Super.* at 109, 219 *A.*2d 332; *Russell–Stanley Corp. v. Plant Industries, Inc.*, 250 *N.J.Super.* 478, 510, 595 *A.*2d 534 (Ch.Div.1991). The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights. *Associates Commercial Corp., supra*, 211 *N.J.Super.* at 244, 511 *A.*2d 709; *see Callano, supra*, 91 *N.J.Super.* 105, 219 *A.*2d 332; *St. Paul Fire & Marine Ins. Co. v. Indemnity Ins. Co.*, 32 *N.J.* 17, 22, 158 *A.*2d 825 (1960).

There is no dispute that the leases were the fruits of VRG's labor. VRG "started with the [shopping] center in its early on stages" and negotiated "each and every lease that went in there to make this development possible." It could be argued that Golden Reef, having failed to pay the earned commissions, was "unjustly enriched" under the circumstances. Golden Reef was able to sell the shopping center for $9,800,000.00, which the trial court found "was the fair market value and [it] took into account the fact that the property was rented and generating rental income and that any leasing commissions still due were to be paid by the seller, Golden Reef." Backos herself acknowledged that the purchase

price of the property reflected its fair market value and took into account Golden Reef's obligation to pay the commissions. The difficulty, however, is that VRG seeks to impose an equitable lien not on the property of Golden Reef, *i.e.*, the proceeds from the sale of the shopping center, but the property of GKN, *i.e.*, its rental income from the shopping center. GKN, in paying fair market value for the shopping center, did not receive an unexpected benefit or undeserved windfall because Golden Reef later broke its promise to pay VRG's commissions. *See Associates Commercial Corp., supra,* 211 *N.J.Super.* at 244, 511 *A.*2d 709. There simply is no evidence in the record to demonstrate that GKN was unjustly enriched at the expense of VRG and that its property should now be subjected to a lien to enforce an obligation owed by Golden Reef.

C.

Lastly, VRG argues that because the shopping center leases were assigned to GKN, the latter is liable for VRG's claim for commissions. The Appellate Division reasoned that because GKN had "actual notice of VRG's claim that the commissions were tied to the rental income" and knew then, "if not satisfied at closing, VRG would look to that income for payment," an equitable lien should be imposed on the rental income of GKN. 261 *N.J.Super.* at 457, 619 *A.*2d 251.

Generally, a lien that is created by or based on an express contract may, equitably, be enforced if the contract is assigned. *See Masten Realty Co., supra,* 125 *N.J.L.* at 530, 16 *A.*2d 464; *Bacharach v. Mitnick,* 121 *N.J.L.* 401, 404, 3 *A.*2d 92 (S.Ct.1938) (holding buyer liable for broker's commissions where contract providing for commissions binds "successors and assigns" of the parties and is assigned); 53 *C.J.S. Liens* § 15, at 478 (1987). However, although notice of such a lien is required, the notice cannot confer greater obligations than those that inhere in or arise out of the assigned contract. *See McCann, supra,* 65 *N.J.* at 313, 322 *A.*2d 161 (rejecting broker's argument that there is implied in

every contract between seller and broker the provision "that a buyer impliedly agrees with the broker that he will pay the commission if the broker cannot legally collect it from seller"); *Sisco v. New Jersey Bank*, 151 *N.J.Super.* 363, 376 *A.*2d 1287 (Law.Div.1977), *aff'd in part, rev'd in part*, 158 *N.J.Super.* 111, 117, 385 *A.*2d 890 (App.Div.1978) (observing that notice of claim is different from notice of equitable lien); *see also Fiberchem, Inc. v. General Plastics, Corp.*, 495 *F.*2d 737 (9th Cir.1974) (holding that exclusive sales representative of bankrupt manufacturer entitled to recover commissions on sales procured by representative from assignee of manufacturer with notice of commission agreement).

However, Golden Reef never assigned the broker's commission agreement to GKN in conjunction with the sale of the shopping center. Nor did the leases or the assignment of the leases include or refer to the obligation to pay commissions. Thus, when property is sold subject to a lease, there is no obligation on the purchaser's part to pay the broker, unless the purchaser affirmatively assumes that obligation. *Longley–Jones Associates, Inc. v. Ircon Realty Co.*, 115 *A.D.*2d 272, 496 *N.Y.S.*2d 155 (1985), *aff'd*, 67 *N.Y.*2d 346, 502 *N.Y.S.*2d 706, 493 *N.E.*2d 930 (1986); *cf. Bacharach, supra*, 121 *N.J.L.* at 402, 3 *A.*2d 92 (holding that commission agreement contained in lease requiring payment of commissions to leasing broker of five percent of rent paid by tenant to owner or owner's assignee, which lease also provided that if tenant purchased the property, the tenant agreed to pay a broker's commission of five percent of the purchase price and, further, bound "successors and assigns," was enforceable against party who bought property and took assignment of lease, even though property was later sold to tenant); Goldstein, *supra*, at 28 ("When property is sold, the obligation of the seller to pay a commission does not follow the purchaser and rest upon the latter's shoulders as a liability. The obligation to pay commission is personal.").

As already demonstrated, there was no agreement to create a lien on rental incomes, nor any implied basis for the establishment

of such a lien. Therefore, the notice of VRG's claim that was given to GKN did not, and could not, constitute the notice of a lien as such. Backos testified that as soon as she learned of the impending sale, she informed GKN's counsel that "there was an ongoing obligation by the landlord to pay a six percent commission *for* these leases that were in the center." (emphasis added). Nevertheless, this was not notice that there was an underlying agreement giving rise to a security interest in the rents. As the trial court found, "VRG, along with GKN, thought all rental payments were to be paid up front on a discounted basis by Golden Reef at the time of closing," and, consistent with that understanding and contrary to any alleged notice of an enforceable lien, "GKN never told VRG that it would pay the commissions."

Consequently, under the circumstances, an equitable lien cannot be imposed on the basis of an assignment.

## IV

The judgment of the Appellate Division is reversed and the judgment of the Law Division is reinstated.

STEIN, J., dissenting.

VRG Corporation (VRG), the exclusive broker for the Heather Croft Square shopping center, successfully leased substantially all of the shopping-center space to commercial tenants, earning a $663,934 commission representing six percent of gross rents for the initial terms of the various leases. Golden Reef Corporation (Golden Reef), the shopping center's owner, insisted on a commission-payment agreement that, except for a $250,000 advance, restricted VRG's compensation to six percent of *each monthly rental payment*, commencing after the $250,000 advance had been "earned," the monthly commission payments to VRG being due within ten days after each rental payment was received by Golden Reef. Thus, although VRG had earned its commission by obtaining signed leases, its right to payment—except for the advance—

was contingent on Golden Reef's receiving each monthly rental payment from every tenant procured by VRG. The initial terms of the leases ranged from five to twenty years.

Before the $250,000 advance commission had been exceeded by six percent of the monthly rental payments, Golden Reef sold the shopping center to GKN Realty Corp. (GKN). Before the closing, Golden Reef agreed to pay VRG the discounted value of the unpaid commissions on the day *after* the closing, but insisted that VRG's representative not attend the closing. GKN was aware of the terms of the initial commission agreement and of Golden Reef's promise to pay the commission after closing, but failed to insist at closing that the unpaid commission be put in escrow to secure VRG's right to payment. (At oral argument, GKN's counsel conceded that creation of an escrow to protect VRG would have been a "more prudent business judgment.") Before the closing, GKN had insisted that the purchase contract be modified to include Golden Reef's agreement to indemnify GKN against any claims asserted by VRG for its commission. GKN also urged that VRG's representative not be present at the closing. In that context, Golden Reef's failure to pay VRG after the closing was almost predictable. (Golden Reef has since filed for bankruptcy.)

VRG instituted this action against GKN, seeking to impose an equitable lien on the monthly rental payments from tenants it had obtained to secure payment of its earned but unpaid commission. The Court summarizes the essential elements of the equitable-lien doctrine, recognizing that such liens may be created either by express agreement between the parties or on the basis of right and justice according to " 'the dictates of equity and conscience, as where a contract of reimbursement could be implied at law * * *.' " *Ante* at 546, 641 *A*.2d at 522 (quoting *Temple v. Clinton Trust Co.*, 1 *N.J.* 219, 226, 62 *A*.2d 690 (1948)). After identifying the established grounds for imposition of an equitable lien, however, the Court ignores the equitable roots of the doctrine and declines to recognize a lien in favor of VRG, primarily because the commission agreement does not specifically pledge the rental

payments as collateral for VRG's commissions. In my view, the Court disregards the underlying equities among the parties and diminishes the equitable considerations that prompted chancery courts to create and apply the doctrine of equitable liens.

I

In 1984, VRG, a real-estate brokerage firm specializing in obtaining long-term tenants for commercial property, undertook to assist Golden Reef and Perlman Enterprises with the development of a shopping center. In addition to assisting with the design, financing, and zoning approvals necessary to develop the project, VRG procured tenants and negotiated long-term leases for Golden Reef and Perlman Enterprises pursuant to an Exclusive Agency to Lease Agreement. Paragraphs four and five of the agreement addressed the issue of VRG's commissions, outlining the method of calculation of the commissions as well as the timing and contingencies associated with payment of the commissions. Paragraph four provided in relevant part:

> [VRG] shall be entitled to a commission for each tenant who enters into a lease for space in the Center during the term of this Agreement equal to six (6%) percent of each monthly gross base rental payment under the initial term of such lease. Each such monthly commission payment shall be paid by [Golden Reef] to [VRG] within ten (10) days after receipt by [Golden Reef] of the subject monthly rental payment.

Paragraph five provided that Golden Reef would pay VRG $250,000 of its commission in advance:

> [Golden Reef] shall pay to [VRG], as advance commissions hereunder, the sum of One Hundred Thousand and No/100 ($100,000.00) Dollars on or before November 1, 1985 and the further sum of One Hundred Fifty Thousand and No/100 ($150,000.00) Dollars on or before the date that the first tenant takes possession of leased space in the Center and commences to pay monthly base rental. Such payments of Two Hundred Fifty Thousand and No/100 ($250,000.00) Dollars shall be credited against the commissions due [VRG] pursuant to paragraph 4 above and [Golden Reef] shall not be obligated to make any payments to [VRG] pursuant to paragraph 4 above until such time as said credit of Two Hundred Thousand Fifty and No/100 ($250,000.00) Dollars has been exhausted.

The agreement resulted from negotiations between Stuart Perlman, a principal of Golden Reef, and Catherine Backos, the vice

president of VRG. At trial, Backos testified that although VRG would have accepted payment of the discounted value of the gross commission in advance ($583,000), Perlman countered with an offer to pay her $250,000 "up front," and to provide her with "a six percent income stream from [the] property" for the remaining life of the leases, an offer that Backos accepted. Backos also agreed to remove a due-on-sale clause from the original draft agreement. As Backos explained at trial:

> [W]hen I was negotiating with them my original draft of the contract had a provision in there that in the event * * * that the property is sold, they then take and pay the commissions off on the discounted basis, okay? Mr. Perlman said to me at the time, *Catherine, this is a long-term holding, I'm going to leave this property to my kids, I want to set this up as an annuity for you. You will have six percent going out. Take that language out of the contract.* (Emphasis added).

VRG obtained the tenants for the shopping center, and Heather Croft Square opened in December 1986. VRG received the $250,000 advance payment pursuant to paragraph five of the agreement. Crediting the $250,000 payment against the six-percent commissions from the monthly rentals, VRG calculated that the $250,000 advance would be "earned" in March 1992, at which time VRG would begin receiving six percent of the monthly gross base rentals.

In January 1989, Backos learned that Perlman and Golden Reef intended to sell the shopping center to GKN. Backos immediately communicated with GKN's real-estate counsel, Donna Steinberg, and informed her that "[VRG] had an ongoing commission contract with Golden Reef Corporation and that if the property was being sold, [she] wanted her to be aware that there was an ongoing obligation by the landlord to pay a six percent commission for these leases that were in that center." As a result of Backos' concerns, a meeting was arranged between David Nussbaum and Roger Gladstone, vice presidents of GKN; Catherine Backos; and Val Galasso, president of VRG. Backos testified that at that meeting, she informed Nussbaum and Gladstone of "the services that we had performed and that there was an ongoing obligation by the landlord to pay * * * the six percent commission * * *."

GKN requested and received from VRG additional information concerning the Exclusive Agency to Lease Agreement. Before the closing, Golden Reef and GKN modified the contract of sale to include a reference to the commissions owed to VRG. Section 12(W) of the contract of sale ultimately provided:

> There are no leasing or brokerage commissions due, unpaid or accruing with respect to the Leases; there are no ongoing obligations to pay any leasing or brokerage commissions under the Leases; and, there are no leasing or brokerage agreements in effect with respect to the Leases; except with respect to certain leasing commissions which may be due VRG Corporation, for which Seller hereby agrees to defend, indemnify and hold Buyer harmless from all liabilities, claims, causes of action, damages, costs, losses and fees (including attorney's fees) incurred by Buyer in connection with any such commission to VRG Corporation.

Nussbaum testified that after discussions with VRG and the principals of Perlman Enterprises concerning VRG's claim for unpaid commissions, that section was amended to include reference to VRG's commissions.

Backos attempted to obtain an agreement from Golden Reef and Clifford Perlman to pay VRG's commissions at the closing. After some negotiation concerning discounting of the commissions, VRG agreed to accept Golden Reef's offer of $236,919.79 in full payment of all future commissions, informing Perlman of that decision in a letter that also stated that Backos would attend the closing and expected payment to VRG at that time. In response, Perlman telephoned Backos to tell her not to attend the closing, but he guaranteed that she would be paid the following day. Backos also testified to a conversation she had with Nussbaum, subsequent to her phone conversation with Perlman, in which Nussbaum also warned Backos that the deal might "fall apart" if she were to show up at the closing and demand payment. As a result, Backos did not go to the closing. Golden Reef filed for bankruptcy several months later and has refused to pay VRG its commissions.

## II

The equitable-lien doctrine traces its origins to the difference between remedies in contract actions traditionally provided at common law, which were typically pecuniary and personal, and

equitable remedies, which generally were directed against some specific property or fund as contrasted with the right to recover a sum of money out of the defendant's general assets. 4 John N. Pomeroy, *A Treatise on Equity Jurisprudence* § 1234 (Spencer W. Symons ed., 5th ed. 1941) [hereinafter *Pomeroy's* ].

> The doctrine of "equitable liens" * * * was introduced for the sole purpose of furnishing a ground for the specific remedies [that] equity confers, operating upon particular identified property, instead of the general pecuniary recoveries granted by courts of law. It follows, therefore, that in a large class of executory contracts, express and implied, which the law regards as creating no property right, nor interest analogous to property, but only a mere personal right and obligation, equity recognizes, *in addition to the personal obligation*, a peculiar right over the thing concerning which the contract deals, which it calls a "lien," and which, though not property, is analogous to property, and by means of which the plaintiff is enabled to follow the identical thing, and to enforce the defendant's obligation by a remedy which operates directly upon that thing. The theory of equitable liens has its ultimate foundation, therefore, in contracts, express or implied, which either deal with or in some manner relate to specific property, such as a tract of land, particular chattels or securities, a certain fund, and the like. It is necessary to divest one's self of the purely legal notion concerning the effect of such contracts, and to recognize the fact that equity regards them as creating a charge upon or hypothecation of the specific thing, by means of which the personal obligation arising from the agreement may be more effectively enforced than by a mere pecuniary recovery at law. [*Ibid.*]

The law is well settled that an equitable lien "may be created by an express contract which shows an intention to charge some particular property with a debt or obligation," 51 *Am.Jur.2d Liens* § 25 (1970), or it may be created without agreement based on general considerations of right and justice arising from the conduct and relations between the parties. *Pomeroy's, supra,* § 1239; 53 *C.J.S. Liens* § 5 (1987).

In respect of liens arising by express contract,

> the agreement must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and must indicate with sufficient clearness an intent that the property so described, or rendered capable of identification, is to be held, given, or transferred as security for the obligation.

[*Pomeroy's, supra*, § 1235.]

Nevertheless, because of the doctrine's equitable origins, no specific formula or language is mandatory before an agreement may be construed to create an equitable lien:

> The form which an agreement shall take in order to create an equitable lien or mortgage is quite immaterial, for equity looks at the final intent and purpose rather than at the form. If an intent to give, charge or pledge property, real or personal, as security for an obligation appears, and the property or thing intended to be given, charged or pledged is sufficiently described or identified, then the equitable lien or mortgage will follow as of course.
>
> [*Rutherford Nat'l Bank v. H.R. Bogle & Co.*, 114 *N.J.Eq.* 571, 574, 169 *A.* 180 (Ch.1933).]

In addition, independently of any express agreement, an equitable lien "may arise by implication out of general considerations of right and justice, where, as applied to the relations of the parties and the circumstances of their dealings, there is some obligation or duty to be enforced." 53 *C.J.S. Liens, supra*, § 8. Our cases have consistently recognized the distinctly equitable foundation on which recognition of equitable liens is predicated:

> The whole doctrine of equitable liens or mortgages is founded upon that cardinal maxim of equity which regards as done that which has been agreed to be, and ought to have been, done. To dedicate property, or to agree to do so, to a particular purpose or debt is regarded in equity as creating an equitable lien thereon in favor of him for whom such dedication is made. This wholesome equitable principle is one of wide, if not universal, recognition and application.
>
> [*Rutherford Nat'l Bank, supra*, 114 *N.J.Eq.* at 573–74, 169 *A.* 180.]

This Court applied the equitable lien doctrine in *In re Hoffman*, 63 *N.J.* 69, 304 *A.*2d 721 (1973), to afford a basis for recovery to an accountant who had prepared and filed amended tax returns for the decedent based on a promise that the accountant's fee would be paid out of the proceeds of any refund received. The decedent's estate was insolvent, and the claims of judgment creditors entitled to priority exceeded the available funds. The accountant was merely a general creditor, not having reduced his claim to judgment. Nevertheless, we imposed an equitable lien on the tax refund to the extent of the accountant's fee, recognizing the inequity of permitting the judgment creditors to derive the entire benefit of the fund created by the accountant's efforts:

An equitable lien "may be created by express executory contracts relating to specific property then existing, or property to be afterward acquired; and sometimes they are raised *ex aequo et bono,* according to the dictates of equity and conscience, as where a contract of reimbursement could be implied at law ...[.]" *Temple v. Clinton Trust Company,* 1 *N.J.* 219, 226 [62 *A.*2d 690] (1948). See also *In re Loring,* 62 *N.J.* 336, 341 [301 *A.*2d 721] (1973). Such a lien is a right of a special nature in a fund and constitutes a charge or encumbrance upon the fund. See [*Pomeroy's, supra,* § 1233; 51 *Am.Jur.2d Liens, supra,* § 22]. Where one promises to pay for services rendered out of a fund created in whole or in part by the efforts of the promisee, a lien in favor of the promisee will attach to the fund when it comes into existence. * * *

\* \* \* \*

None of the parties has disputed that Robert Hoffman intended to pay the fee of Brooks from the amount received through the tax refund. Since the fund was created by the efforts of Brooks, we think that his claim falls within the definition of an equitable lien. Accordingly, before others receive the benefit of his efforts, equity requires that Brooks' claim be satisfied.

[*Id.* at 77–78, 304 *A.*2d 721.]

### III

The Court first concludes that neither the express terms of the commission agreement between VRG and Golden Reef nor evidence concerning the intent of the parties "establish[es] an implied agreement that the rents were to be pledged or dedicated as security for payment of commissions." *Ante* at 552, 641 *A.*2d at 525. The Court observes that the language of the agreement "makes clear that the rents are used only as a measure of the amount and timing of commission payments, not as their source or security." *Ante* at 550, 641 *A.*2d at 524.

The Court's analysis imposes a too-heavy burden on the literal language of the commission agreement. "The form which an agreement shall take in order to create an equitable lien or mortgage is quite immaterial * * *." *Rutherford Nat'l Bank, supra,* 114 *N.J.Eq.* at 574, 169 *A.* 180. If the majority is correct in its assumption that a necessary predicate to recognition of an equitable lien is an agreement "that the rents were to be pledged or dedicated as security for payment of commissions," *ante* at 552, 641 *A.*2d at 525, resort to the equitable-lien doctrine would be unnecessary. Had the language been sufficiently specific, VRG

arguably could have filed a UCC–1 financing statement or record-
ed an assignment of rents, as GKN acknowledges in its post-
argument letter brief. To require as a condition for recognition of
an equitable lien language in the commission agreement specific
enough to create a security interest requiring filing of a financing
statement, *N.J.S.A.* 12A:9–302, or to require provision for an
assignment of rents sufficiently specific to permit recording with
the County Clerk, would be inconsistent with the origins of the
doctrine of equitable liens. "[B]ut the doctrine of equitable liens
would never have come into existence if it were true that one who
claims such a lien must first show a lien at law. Equitable liens
become necessary on account of the absence of similar remedies at
law." *Jones v. Carpenter,* 90 *Fla.* 407, 106 *So.* 127, 128–29 (1925).

The Court's analysis also highlights language in the contract
stating that the commission shall be "equal to" six percent of the
rents collected each month, and notes that that language does not
provide specifically that VRG would receive six percent of the
rents collected. The language relied on by the majority, however,
must be examined in the context of the agreement as a whole.
*See Elam v. Monarch Life Ins. Co.,* 598 *A.*2d 1167 (D.C.1991)
(holding that contingency-fee agreement between attorney and
client showed sufficient intent to create equitable lien in favor of
attorney, and that "stringent rule making the existence of an
attorney's lien depend * * * on whether words of equivalency ('a
sum equal to') or identity ('thirty percent of the funds recovered')
are used" should not be followed).

Other language in the agreement clearly conveys Golden Reef's
intention to pay VRG out of the rents. Notably, the commissions
were contingent on the collection of rents. Furthermore, the six-
percent commissions were to be calculated only on the basis of the
amount of rent collected each month. Thus, if a lessee were late
in paying its rent, VRG would have to wait until payment was
made before receiving its six-percent monthly commission on that
lease. The timing of the commission payments also suggests that
they were to be paid out of the rents collected: "Each such

monthly commission payment shall be paid by [Golden Reef] to [VRG] within ten (10) days after receipt by [Golden Reef] of the subject monthly rental payment."

Not only the language of the commission agreement confirms the inextricable connection between the monthly rental payments and VRG's commission. As the trial court observed, the shopping-center leases ranged in length from five to twenty years, with the result that VRG would not have been paid in full until twenty years after the opening of the shopping center. As David Nussbaum, GKN's vice president testified at trial, commissions to brokers for procuring GKN's shopping-center tenants were customarily paid over a much shorter term and were not tied to the length of the underlying leases:

> Q  In your experience how are leasing brokers usually paid their commissions?
>
> A  You know, there are a series of different, you know, ways to go. We typically pay a leasing broker $3 a square foot on small space, $2 a square foot on medium sized space and $1 a square foot on large space. So if somebody leased a 10,000 square foot space which we would consider medium size, they would get a $20,000 commission and *we would either pay half of that on execution of the lease and the remainder over a year or two or three, whatever.*
>
> The payment schedule would be subject to negotiation with the leasing broker wanting to get as much as possible upon execution of the lease. (Emphasis added).

*See also* Bernard H. Goldstein, *A Documentary Guide to Commercial Leasing* 27 (Supp.1990) (stating, "It is a common practice in lease transactions to have the broker's commission payable in installments over the earlier years of the term of the lease.").

Thus, by linking its obligation to pay VRG's brokerage commission with the collection of each installment of monthly rent under each of the leases procured by VRG, Golden Reef effectively acknowledged its intention to pay VRG from the monthly rent collections, although no express pledge of the rents as collateral is set forth in the commission agreement. "Where one promises to pay for services rendered out of a fund created in whole or in part by the efforts of the promisee, a lien in favor of the promisee will attach to the fund when it comes into existence." *Hoffman, supra,* 63 *N.J.* at 77, 304 *A.*2d 721.

Although rejecting the express provisions of the commission agreement as a basis for imposing an equitable lien, the Court acknowledges that an equitable lien may be founded on "'the dictates of equity and conscience * * *.'" *Ante* at 546, 641 *A.*2d at 522 (quoting *Temple, supra*, 1 *N.J.* at 226, 62 *A.*2d 690). The Court, however, emphasizes unduly the need for proof of unjust enrichment as a prerequisite for recognition of an equitable lien apart from an express contract, and concludes that because GKN was not unjustly enriched, imposition of an equitable lien against it is precluded. *Ante* at 553–55, 641 *A.*2d at 526.

The treatises and precedents, however, do not insist on a finding of unjust enrichment and recognize that an equitable lien, if not arising from an express contract, "is implied and declared by a court of equity out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings." *Farmers & Merchants Bank v. Commissioner*, 175 *F.*2d 846, 849 (8th Cir.1949); *accord United States v. 1364.- 76875 Wine Gallons, More or Less, of Spirituous Liquors*, 60 *F.Supp.* 389, 392 (E.D.Mo.1945); *Fallon v. Worthington*, 13 *Colo.* 559, 22 *P.* 960, 962 (1889); *Johnson v. Craig*, 158 *Fla.* 254, 28 *So.*2d 696, 699 (1947); *Pomeroy's, supra*, § 1239; 51 *Am.Jur.2d Liens, supra*, § 30; 53 *C.J.S. Liens, supra*, § 5. As one court has noted:

"An equitable lien does not of necessity rest exclusively upon an express agreement. It may arise from circumstances of such nature as to require the presumption upon general considerations of justice as between those conducting commercial transactions according to a reasonable standard of integrity that an equitable lien was meant. * * * If the arrangement between the parties, interpreted in the light of the conditions in which they were placed, indicates a contemporaneous intention to adjust their rights upon a basis which can be established only by resort to the equitable principle of lien or pledge, then, in the absence of an intervening adversary interest, such an intent will be executed in chancery."

[*Meteor Prods. Co. v. Societe d'electro chimie et d'electro metallurgie*, 263 *Mass.* 543, 161 *N.E.* 875, 877 (1928) (alteration in original) (quoting *Westall v. Wood*, 212 *Mass.* 540, 99 *N.E.* 325, 325–26 (1912)).]

Apart from the express agreement between VRG and Golden Reef, "general considerations of right and justice" support the imposition of an equitable lien on the shopping-center rents in

favor of VRG, on the basis of GKN's failure to condition the closing on proof that VRG's commissions had been paid. GKN's officer testified, and the purchase agreement confirmed, that Golden Reef was to remain responsible for the commissions. GKN's attorneys necessarily were aware that VRG, if not paid by Golden Reef, could attempt to recover the unpaid commissions from GKN, having modified the contract of sale specifically to require Golden Reef to indemnify GKN against such a claim. The concession by GKN's counsel at oral argument that the "more prudent business judgment" would have required GKN to condition the closing on establishment of an escrow fund to secure payment of VRG's commissions may understate GKN's obligation. GKN either was inadequately advised of the risk of closing without securing payment of VRG's commissions or, if adequately advised, elected to bear that risk in order to induce Golden Reef to close, and possibly to provide Golden Reef with added leverage in its negotiations with VRG. In either case GKN participated in structuring the closing in a manner that did not adequately protect VRG's interests, of which GKN had been fully informed. In that context, a court would be hard pressed to find more compelling grounds for recognition of an equitable lien based on "general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings." *Farmers & Merchants Bank, supra,* 175 *F.*2d at 849. Combining the circumstances of the closing with the provisions of the commission-payment agreement, the case for recognition of an equitable lien in favor of VRG is clear and compelling.

Other courts have not been reluctant to acknowledge and protect equitable interests strikingly analogous to those that the Court's opinion deems undeserving of protection by recognition of an equitable lien. In *Fiberchem, Inc. v. General Plastics Corp.,* 495 *F.*2d 737 (1974), the Ninth Circuit enforced commission claims of the exclusive sales agent of a defunct manufacturer against the purchaser of the manufacturer's outstanding sales orders who had refused to pay the commissions. Fiberchem, the sales agent, sued Rowland, the purchaser, for commissions on sales by Rowland to

Boeing Corporation (Boeing) based on Boeing purchase orders that Rowland had acquired from General Plastics, the manufacturer. Rowland was aware of General Plastic's obligation to Fiberchem, but Rowland's agreement with General Plastics disclaimed any assumption of liability for commissions to Fiberchem. Rejecting Rowland's contention that it had purchased General Plastic's assets free of any claims by Fiberchem, the court observed:

> We discuss first Rowland's argument that it is not liable at all for commissions to Fiberchem. Although there is some dispute whether or not an assignee for value takes his claim free from the equities of third persons against the assignor, of which the assignee had no notice, there is no dispute that the assignee takes his claim subject to the equities of third persons against the assigned right where he has knowledge of such equities.  * * *

> Here, it is undisputed that Rowland purchased assets from General with full knowledge of Fiberchem's right to commissions. Rowland had ample opportunity to negotiate with General for a purchase price that would take into account Rowland's possible liability to Fiberchem. In fact, there is some evidence in the record suggesting that the purchase price actually was determined with an eye toward such liability. Moreover, the clause in the General-Rowland contract in which Rowland disclaimed liability for sales commissions, though ineffective here against the claims of Fiberchem, may well permit Rowland to seek indemnification from General. Hence, we conclude that Rowland is liable to Fiberchem for commissions on the outstanding purchase orders assigned to it by General.

> [*Id.* at 738–39 (citations omitted).]

Although Fiberchem did not seek recovery on the basis of the equitable-lien doctrine, the court expressly recognized its potential applicability:

> This same result perhaps could be reached on the theory that Fiberchem, as the procuring cause of the sales to Boeing, has an equitable lien on the proceeds of these sales to the extent of the commissions earned. This equitable lien could be enforced against an assignee of the purchase orders with notice of the existence of the commission agreement (Rowland), as well as against the original contractor (General). However, since the theory of equitable liens was never raised either here or in the district court, we are reluctant to base our decision upon it.

> [*Id.* at 739 n. 1 (citations omitted).]

The facts at hand are even more compelling than those that prompted the Ninth Circuit to protect Fiberchem's claim for sales commissions. Imposition of an equitable lien against the rental

payments due under the shopping-center leases would result in no injustice to GKN. It acquired the shopping center with full notice of VRG's claim and contract rights, and it structured the transaction in a manner that exposed it to the very risk that has transpired: that Golden Reef would fail to pay the balance of commissions and VRG would assert its claim against GKN. That VRG has no express security interest in the rents because its commission agreement did not provide "that the rents were to be pledged or dedicated as security for payment of commissions," *ante* at 552, 641 *A.*2d at 524 is no bar to recognition of an equitable lien. To the contrary, "[e]quitable liens become necessary on account of the absence of similar remedies at law." *Jones, supra,* 106 *So.* at 128. VRG's claim, in the context of GKN's indefensible failure to assure that Golden Reef paid VRG's commissions as a condition of closing, presents a classic example of the equitable-lien doctrine's capacity to provide relief that would not otherwise be available in a suit for money damages.

I would affirm the judgment of the Appellate Division.

Justice Clifford joins in this opinion.

*For reversal & reinstatement*—Chief Justice WILENTZ, and Justices POLLOCK, O'HERN, GARIBALDI and HANDLER–5.

*For affirmance*—Justices STEIN and CLIFFORD–2.