965 A.2d 1172

PAGANO COMPANY, PLAINTIFF–APPELLANT,
v. 48 SOUTH FRANKLIN TURNPIKE, LLC,
DEFENDANT–RESPONDENT.

Argued December 3, 2008—Decided March 9, 2009.

108

*Andrew J. Karas* argued the cause for appellant (*Feitlin, Youngman, Karas & Youngman,* attorneys).

*Cory Mitchell Gray* argued the cause for respondent (*Greenberg Traurig,* attorneys).

Justice LONG delivered the opinion of the Court.

At issue in this appeal is whether a purchaser of commercial property is liable for the real estate broker commissions due under the leases it acquired under a general assignment from the seller. In *VRG Corp. v. GKN Realty Corp.,* 135 *N.J.* 539, 556, 641 *A.*2d 519 (1994), we held that in order to incur liability by virtue of such an assignment, the purchaser must have "affirmatively assume[d]" the seller's obligation to pay the commissions. A separate express promise by the purchaser to pay broker commissions certainly will satisfy that standard. But that is not the only way to do so. Rather, determining whether an "affirmative assumption" has taken place requires an analysis of all of the facts and circumstances surrounding the assignment and, in particular, the documentary record. If, taken as a whole, the record signals that the assignee agreed to assume the obligation, he or she will be held to it despite the absence of a separate express promise to do so. Applying that standard, we hold that the purchaser in this case affirmatively assumed the commission agreement between the seller and the broker.

## I.

In February 1997, plaintiff Pagano Company ("Pagano"), a licensed real estate broker, entered into an agreement with Heri-

tage III Office Center ("Heritage"), the owner of commercial property located at 48 South Franklin Turnpike in Ramsey.[1] That agreement gave Pagano the exclusive right to procure tenants to lease space in the property, and to negotiate those tenants' leases on behalf of Heritage. The agreement also provided that the "Owner agrees to pay PAGANO COMPANY a Real Estate Brokerage commission of five (5%) percent of the total lease price" in connection with any lease entered into pursuant to the brokerage agreement, including any options, extensions, and renewals. The "Schedule of Lease Commissions" accompanying the brokerage agreement addressed the commission obligation in the event of an assignment:

> The undersigned Owner hereby acknowledges receipt of a copy of this Schedule and further agrees that it shall be binding upon the heirs, successors and assigns of the undersigned. The term Owner when used herein shall be deemed to mean the owner of the property, a Tenant under a ground lease, and any Tenant desiring to effect a sublease[ ].

In June 2004, Heritage and defendant 48 South Franklin Turnpike, LLC ("Franklin") entered into a contract for the purchase and sale of the property. That contract included a "Due Diligence and Investigation" provision granting Franklin

> a period of thirty (30) days from the date of this Agreement ... to perform the following inspections in order to satisfy itself as to the condition of the Property, specifically:

> 4.1.1 Business Records. During the Due Diligence Period, Buyer shall have the right to review the books and records relating to the Property, including but not limited to:

> A. Copies of all leases presently in effect;

> B. Copies of all correspondence relating to present tenants;

> C. Any correspondence with municipal or other governing authorities relating to the Premises;

> D. Any and all statements of rents due and received maintained by Seller or Seller's manager(s); and

> E. Operating statements for the past three (3) years[.]

---

[1] These parties were not entirely unaffiliated: the principals in Pagano held a thirteen percent interest in Heritage.

Exhibit B of the contract provided that if "Buyer has been unable to locate a document or information which the Buyer feels is required to complete its due diligence, Buyer shall notify Seller that it requires such information/documentation and Seller shall make reasonable efforts to provide such information/documentation to Buyer."

Franklin "reviewed the Lease Agreements at issue during the due diligence period and made no further requests for any additional documents from the Seller." A closing was held on September 20, 2004, and, as part of that transaction, Heritage assigned to Franklin "all of the Leases, Rents and Security deposits related to any and all existing tenancies at the Property," and Franklin agreed to assume all of Heritage's obligations under those tenancies:

1. Assignment. *Assignor hereby assigns to Assignee all of Assignor's right, title and interest in and to*

(a) *any and all leases, tenancies, licenses, rental agreements, occupancy agreements and other agreements of whatever form now or hereafter affecting all or any part of the Property* and any and all guarantees, extensions, renewals, replacements and modifications thereof and all remainders, reversions and other rights and estates appurtenant thereto, including, but not limited to renewal options and expansion rights, all modifications, extensions and renewals thereof and all rights to renew or extend the te[r]m thereof, all right and privilege of Assignor to terminate, cancel, abridge, merge, modify, surrender or amend the foregoing and any and all possessory rights of Assignor and other rights and/or privileges of possession (collectively, the "Leases"); and

. . . .

2. Performance of duties. *Assignee hereby assumes and agrees to perform all of Assignor's obligations under the Leases.* Assignee shall indemnify and hold harmless Assignor from and against any claim, liability, and expense which Assignee may incur (including, without limitation, attorneys' fees and litigation expenses) that arise[ ] out of Assignee's performance of, or failure to perform the obligations assumed hereby.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns.

[ (Emphasis added).]

At the time Franklin purchased the property, three tenants still occupied the space pursuant to lease agreements and extensions procured and negotiated by Pagano. The specifics of those leases are unimportant except insofar as they contained the following

paragraph relating to the applicability of the leases to each party's successors:

> 41. APPLICABILITY TO HEIRS AND ASSIGNS: *The provisions of this Lease shall apply to, bind and [i]nure to the benefit of Lessor and Lessee, and their respective* heirs, successors, legal representatives and *assigns.* It is understood that the term "Lessor" as used in this Lease means only the Owner, a mortgagee in possession[,] or a term lessee of the Building, so that *in the event of any sale of the Building* or of any lease thereof, or if a mortgagee shall take possession of the Premises, the Lessor named herein shall be and hereby [i]s entirely freed and relieved of all covenants and obligations of Lessor hereunder accruing thereafter, and *it shall be deemed without further agreement that the purchaser,* the term lessee of the Building, or the mortgagee in possession *has assumed and agreed to carry out any and all covenants and obligations of the Lessor hereunder.*
> [ (Emphasis added).]

Each lease also contained, in pertinent part, the following paragraph explaining the Lessor's liability for commissions owed to Pagano:

> 44. BROKER: Lessee represents and warrants to Lessor that Pagano Company is the exclusive broker with whom Lessee has negotiated in bringing about this Lease. Lessor represents and warrants to Lessee that Lessor dealt exclusively with Pagano Company and that *by separate commission agreement and letter of understanding said broker shall be paid a commission by Lessor.* In consideration of the foregoing, *Lessor agrees to fully satisfy its obligations to said broker for commissions* and covenants and agrees to indemnify and save Lessee harmless with respect to the claims of said broker for said commissions.
> [ (Emphasis added).]

After acquiring title to the property from Heritage, Franklin never paid commissions to Pagano for the rents received under the leases with the three relevant tenants. Thereafter, Pagano filed suit against Franklin to recover the outstanding commissions due for the rents paid by the tenants from September 20, 2004, to the date each vacated its leased premises. A bench trial was held, at which an agreed-upon documentary record consisting of a joint stipulation of facts, joint exhibits, and each party's proffered testimony was submitted.

The trial judge, Judge Robert Polifroni, agreed with the parties that this Court's decision in *VRG* controlled disposition of the case, and concluded that the leases, the assignment of those leases, the purchase agreement, and the deed, "when read and considered together," established that Franklin in fact "affirma-

tively assumed" the obligation to pay Pagano's commissions. In particular, the judge found persuasive that "[e]ach lease specifically sets forth the exclusive Brokerage Arrangement involving plaintiff Pagano Company, and each [l]ease specifically references the separate commission agreement ... , and further that the Lessor agreed to satisfy its obligation to the broker."

The trial judge entered judgment for Pagano in the amount of $16,343, plus pre-judgment interest. Franklin appealed, challenging the judge's conclusion that it had "affirmatively assumed" the obligation to pay Pagano's commissions.

In an unpublished opinion, the Appellate Division reversed, concluding that Franklin "never contractually agreed to pay Pagano commissions." Like the trial judge, the panel viewed VRG as controlling. However, the panel interpreted the "affirmative assumption" rule of VRG to require an express agreement by the purchaser to assume the commission obligation, separate from, and in addition to, accepting the general assignment of the leases. Because "[n]owhere in the contract, closing documents, assignment, or indeed in any other document did [Franklin] make a promise to either Heritage or Pagano to pay commissions to Pagano," the panel held that Franklin did not "affirmatively assume" an obligation to pay any commissions to Pagano.

Pagano filed a petition for certification that we granted. 195 N.J. 522, 950 A.2d 908 (2008).[2] We now reverse.

## II.

Pagano argues that under VRG all that is necessary for affirmative assumption of a commission obligation is a specific reference to it in the leases, coupled with a general assignment of those

---

[2] Pagano's petition challenged the panel's decision regarding the issue of affirmative assumption. Although Franklin raised other issues before the Appellate Division, no cross-petition for certification was filed.

leases. Franklin counters that *VRG* requires an express promise by the assignee to satisfy the broker commission obligation, and that the assignment of leases referring to a separate commission agreement between Heritage and Pagano is an insufficient basis on which to find that Franklin affirmatively assumed that particular obligation.

### III.

The outcome of this case turns on the application of the rule set forth in *VRG, supra,* 135 *N.J.* at 556, 641 *A.*2d 519, which would impose liability on Franklin only if it "affirmatively assume[d]" the broker commission obligation at issue here.

In *VRG, supra,* the plaintiff, VRG Corporation ("VRG"), was a real estate broker specializing in securing tenants for commercial property. 135 *N.J.* at 543, 641 *A.*2d 519. With an "Exclusive Agency to Lease Agreement," Golden Reef Corporation ("Golden Reef") enlisted the services of VRG to obtain tenants for a shopping center. *Ibid.* Golden Reef agreed to a commission provision entitling VRG to "six percent of each monthly rental payment received from the tenants that it procured." *Ibid.* Notably, VRG agreed to remove a provision in the original draft that would have ensured "an accelerated payment of all commissions due from the proceeds of any sale of the property." *Id.* at 544, 641 *A.*2d 519. The final agreement bound the successors and assigns of VRG and Golden Reef. *Ibid.* VRG successfully procured tenants in time for the shopping center's opening in December 1986. *Ibid.*

In February 1989, Golden Reef contracted to sell the shopping center to the defendant, GKN Realty Corporation ("GKN"). *Ibid.* When VRG became aware of the impending sale, it notified GKN that "[VRG] had an ongoing commission contract with Golden Reef Corporation and that if the property were being sold, [VRG] wanted [GKN] to be aware that there was an ongoing obligation by the landlord to pay a six percent commission for these leases." *Ibid.* (quotation marks omitted).

As a result of that notification, GKN amended its original contract with Golden Reef. *Ibid.* Although the initial contract did not address potential liability for VRG's commissions, the amended contract included a provision indemnifying GKN and holding Golden Reef, the assignor, solely responsible for payment of those commissions. *Id.* at 544–45, 641 *A.2d* 519.

Golden Reef and GKN eventually held the closing, at which Golden Reef assigned to GKN all rights and title to, and interests in, the VRG-procured leases, *id.* at 545, 641 *A.2d* 519, which were silent regarding the broker commissions, *id.* at 556, 641 *A.2d* 519. Golden Reef never paid VRG's commissions and ultimately filed for bankruptcy, leading VRG to sue GKN for the nearly $310,000 balance. *Id.* at 545, 641 *A.2d* 519.

VRG presented three distinct arguments, each of which sought the same remedial device—an equitable lien on GKN's rental income.[3] *Ibid.* Germane to this appeal, VRG contended that it was entitled to an equitable lien on GKN's rental income as an automatic consequence of the general assignment of the shopping center leases. *Id.* at 555, 641 *A.2d* 519.

Justice Handler, writing for the Court, began with the unremarkable principle that "when property is sold subject to a lease,

---

[3] Two of those arguments were that Golden Reef and VRG in fact contemplated a lien on the rental income and, alternatively, that without imposing a lien, GKN would be unjustly enriched. *VRG, supra,* 135 *N.J.* at 548–55, 641 *A.2d* 519. Those arguments are not advanced here. However, for the sake of completeness, we summarize our conclusions. With regard to the former, we held that neither the language of the contract, nor the circumstances surrounding its formation, supported the assertion that the parties ever envisioned the rental income as security for the commissions. *Id.* at 549–50, 641 *A.2d* 519. Rather, we observed the contrary: that "[VRG's] actions were consistent with the understanding that its commissions were unsecured, their payment was the obligation of Golden Reef and, accordingly, it sought to be paid out of the closing proceeds, not out of dedicated future rents." *Id.* at 552, 641 *A.2d* 519. We further held, in connection with our rejection of VRG's unjust enrichment claim: "[t]he difficulty ... is that VRG seeks to impose an equitable lien not on [Golden Reef's] proceeds from the sale ... , but the property of GKN, *i.e.,* its rental income from the shopping center." *Id.* at 555, 641 *A.2d* 519.

there is no obligation on the purchaser's part to pay the broker, *unless the purchaser affirmatively assumes that obligation." Id.* at 556, 641 *A.2d* 519 (emphasis added) (citing *Longley–Jones Assocs., Inc. v. Ircon Realty Co.,* 115 *A.D.2d* 272, 496 *N.Y.S.2d* 155 (1985), *aff'd,* 67 *N.Y.2d* 346, 502 *N.Y.S.2d* 706, 493 *N.E.2d* 930 (1986)). Where such an affirmative assumption takes place, the assignee will be subject to the obligations he or she assumed. *See Bacharach v. Mitnick,* 121 *N.J.L.* 401, 403–04, 3 *A.2d* 92 (S.Ct. 1938). Among the ways identified in *VRG, supra,* for an affirmative assumption to occur is by a specific assignment of the broker's commission agreement or by reference either in the general assignment agreement or in the lease itself. 135 *N.J.* at 556, 641 *A.2d* 519. Indeed, the Court in *VRG* noted that "Golden Reef never assigned the broker's commission agreement to GKN in conjunction with the sale of the shopping center. *Nor did the leases or the assignment of the leases include or refer to the obligation to pay commissions." Ibid.* (emphasis added). *VRG* held ultimately that, under the circumstances presented, GKN did not "affirmatively assume" the obligation to pay VRG's commissions, especially in light of the fact that GKN amended the purchase agreement explicitly to avoid that particular liability. *Id.* at 556–57, 641 *A.2d* 519.

A fair reading of *VRG, supra,* leads ineluctably to the conclusion that the "affirmative assumption" of an obligation to pay a broker's commission, which is " 'personal,' " 135 *N.J.* at 556, 641 *A.2d* 519 (quoting Bernard H. Goldstein, *A Documentary Guide to Commercial Leasing* 28 (1990 Supp.)), can take many forms. Obviously, an express promise by the assignee to satisfy the commission obligation is one of those forms. But it is not the only one. Although it would be "grossly onerous and unfair" to hold that in all contracts "a buyer impliedly agrees with the broker that he will pay the commission if the broker cannot legally collect it from the seller," *McCann v. Biss,* 65 *N.J.* 301, 313, 322 *A.2d* 161 (1974), *VRG* affirmed the intuitively correct notion that where a purchaser accepts assignment of leases that *"include or*

*refer to* the obligation to pay commissions," he or she may be considered to have affirmatively assumed that obligation. *VRG, supra*, 135 *N.J.* at 556, 641 *A.*2d 519 (emphasis added).

The record in *VRG, supra*, was insufficient to support the broker's allegation that the assignee assumed responsibility for the commission obligation. 135 *N.J.* at 556–57, 641 *A.*2d 519. First, neither the leases nor the assignment of those leases included or referred to the commission obligation between the assignor and the broker. *Id.* at 556, 641 *A.*2d 519. Second, the assignor and assignee purposefully and explicitly amended the assignment contract to maintain the former's liability for that obligation. *Id.* at 544–45, 641 *A.*2d 519. We thus concluded,

> VRG, along with GKN, thought all rental payments were to be paid up front on a discounted basis by Golden Reef at the time of closing, and, consistent with that understanding and contrary to any alleged notice of an enforceable lien, GKN never told VRG that it would pay the commissions.
>
> [*Id.* at 557, 641 *A.*2d 519 (quotation marks omitted).]

In short, GKN prevailed in *VRG* not merely because it never expressly assumed the commission obligation, but because the assignment and the leases themselves were silent regarding that obligation and because the record revealed a contrary intention by the parties.

## IV.

We turn now to the facts of this case, which satisfy us that Franklin affirmatively assumed the obligation to pay Pagano's commissions.

Heritage specifically assigned to Franklin all of the "leases . . . and other agreements of whatever form . . . affecting all or any part of the Property." Under the leases, the term "Lessor" not only applies to Heritage, but also to any successors such as Franklin:

> 41. APPLICABILITY TO HEIRS AND ASSIGNS: The provisions of this Lease shall apply to, bind and [i]nure to the benefit of Lessor and Lessee, and their respective heirs, successors, legal representatives and assigns. It is understood that the term "Lessor" as used in this Lease means only the Owner . . so that *in the event of any sale of the Building* . . . , the Lessor named herein shall be and

> hereby [i]s entirely freed and relieved of all covenants and obligations of Lessor hereunder accruing thereafter, and *it shall be deemed without further agreement that the purchaser ... has assumed and agreed to carry out any and all covenants and obligations of the Lessor hereunder.*
>
> [ (Emphasis added).]

Further, unlike *VRG, supra,* where neither the leases nor the assignment of the leases included or referred to the obligation to pay commissions, 135 *N.J.* at 556, 641 *A.*2d 519, here, each assigned lease contained, in pertinent part, the following paragraph detailing Pagano's role in the leasing of the premises, and referring to the Lessor's liability for commissions owed to Pagano:

> 44. BROKER: Lessee represents and warrants to Lessor that Pagano Company is the exclusive broker with whom Lessee has negotiated in bringing about this Lease. Lessor represents and warrants to Lessee that Lessor dealt exclusively with Pagano Company and that *by separate commission agreement and letter of understanding said broker shall be paid a commission by Lessor. In consideration of the foregoing, Lessor agrees to fully satisfy its obligations to said broker for commissions* and covenants and agrees to indemnify and save Lessee harmless with respect to the claims of said broker for said commissions.
>
> [ (Emphasis added).]

According to the Appellate Division, "[t]he only obligation the lessor has in the leases regarding the broker's commissions is the duty to indemnify and hold the tenants harmless for claims of the broker." We disagree with that rather crabbed interpretation of Paragraph 44. As the emphasized segment reveals, the panel's interpretation reads only the indemnification language and ignores the first portion of the final sentence, which specifically recognizes that the *"Lessor"* is fully responsible to the broker. (Emphasis added). In exchange for Heritage's "right, title and interest in and to" all leases, rents, and security deposits associated with the subject property, Franklin "assume[d] and agree[d] to perform all of [Heritage's] obligations under the Leases." Those obligations included the commission agreement to which Paragraph 44 specifically referred.

Franklin, a sophisticated purchaser of commercial property, had a fair opportunity to request access to the agreement with Pagano, or at least to register any concerns caused by the foregoing promises before agreeing to the assignment. Although denying

that it ever reviewed the actual commission agreement between Pagano and Heritage, Franklin conceded that it reviewed the leases—all of which contained the foregoing provisions—during the thirty-day "Due Diligence and Investigation" period. Franklin also conceded that it "made no further requests for any additional documents from the Seller," though it was permitted to do so under Exhibit B of the purchase and sale agreement. Unlike the broker in *VRG, supra,* who could not show that the assignee ever accepted responsibility for the assignor's preexisting obligation to pay commissions, 135 *N.J.* at 556–57, 641 *A.*2d 519, Pagano has carried that burden with proof that, after a due diligence period yielding no objections, Franklin accepted a general assignment of leases that specifically referred to the commission obligation between Pagano and the "Lessor." In short, this record bespeaks an affirmative assumption.

## V.

The judgment of the Appellate Division is reversed and the judgment of the Law Division is reinstated.

Justice LaVECCHIA, dissenting.

As the majority duly notes, the obligation to pay a brokerage fee or commission is "personal." *Ante* at 116, 965 *A.*2d at 1177. In other words, it does not attach to the land and run to a subsequent owner of the property. *See VRG Corp. v. GKN Realty Corp.,* 135 *N.J.* 539, 556, 641 *A.*2d 519 (1994) (citing *Longley–Jones Assocs., Inc. v. Ircon Realty Co.,* 115 *A.D.*2d 272, 496 *N.Y.S.*2d 155, *aff'd,* 67 *N.Y.*2d 346, 502 *N.Y.S.*2d 706, 493 *N.E.*2d 930 (1986) (stating that "grantee is only liable for those covenants that run with land [and a] covenant in a lease to pay a broker's commission upon renewal of the lease does not run with the land") (internal citations omitted)). For such an obligation to attach to a purchaser of real estate, when the seller had only a personal contract requiring the payment of commissions to a real

estate broker, the purchaser must "affirmatively assume" the obligation. *Id.* at 556, 641 *A.2d* 519.

For more than a decade, skilled professionals in the world of commercial real estate relied on our decision in *VRG*. Through its insistence on an affirmative assumption of a specific fee obligation to a real estate broker, *VRG* provided clarity for that marketplace. Because, in my view, the requirement of a clear and unequivocal affirmative assumption of such an obligation brings valuable structure and certainty to the commercial real estate marketplace, I would take a strict approach when examining documents said to contain a purchaser's affirmative agreement to assume an otherwise personal contractual responsibility of the seller. Thus, the bar should be high when examining the documents said to contain an affirmative undertaking by the purchaser to pay to a broker the fees or commissions that would have been due under the seller's purely personal contract with the broker.

In this case, I find, quite simply, that what was, in fact, done, did not pass muster. As the Appellate Division noted in its own examination of this matter,

[n]owhere in this record has defendant agreed to pay any commissions to Pagano. Defendant merely agreed to assume all of the lessor's obligations in the leases. The only obligation the lessor has in the leases regarding the broker's commissions is the duty to indemnify and hold the tenants harmless for claims of the broker. Paragraph 44 of each lease states that "Lessor represents and warrants to Lessee that Lessor has dealt exclusively with Pagano Company and that by separate commission agreement letter of understanding said broker shall be paid a commission by Lessor." This sentence is a representation and warranty to the tenants, not the undertaking of an affirmative obligation to Pagano. The sentence further expressly states that the lessor's obligations to the broker are determined in a separate brokerage agreement. Thus, Pagano's right to commissions arises from the separate brokerage agreement and not from the lease. The balance of paragraph 44 requires the lessor to pay its obligations to Pagano and to indemnify and hold the tenants harmless if Pagano makes claims against the tenants for broker's commissions.

The provisions in the leases reflect the agreement between the lessor and lessees setting forth their rights and obligations to each other. Pagano is not a party to the leases, and no promises are made to Pagano in the leases. Nowhere in the contract, closing documents, assignment, or indeed in any other document did

defendant make a promise to either Heritage or Pagano to pay commissions to Pagano.[1]

Furthermore, in addition to the Appellate Division's reasoned observations, neither the Exclusive Leasing Agreement nor the Schedule of Lease Commissions unequivocally indicates that it will have ongoing effect. Nor do the documents set forth any specific commission obligation to be assumed. The contradictory language in those documents, about what is due, when, and for how long, introduces ambiguity into the analysis, leading to an inconclusive combined effect in respect of any clear ongoing liability for fees. For me, that additional ambiguity further undermines the persuasiveness of the totality-of-the-circumstances analysis employed by the majority to reach its conclusion in this matter.

In sum, I find insufficient evidence in the pertinent documents to hold the purchaser of this property liable. I agree with the Appellate Division that held that the general assignment executed here, which incorporated by reference lease documents that did not contain any covenant or promise to the broker about the payment of commissions, failed to demonstrate a clear affirmative assumption by the purchaser to pay broker commissions. Accordingly, I respectfully dissent. I would affirm the judgment of the Appellate Division.

Chief Justice RABNER joins in this opinion.

*For reversal and reinstatement*—Justices LONG, ALBIN, WALLACE, RIVERA–SOTO and HOENS—5.

*For affirmance*—Chief Justice RABNER and Justice LaVECCHIA—2.

---

[1] The Appellate Division further noted the important factual distinctions between this case and that of *Bacharach v. Mitnick*, 121 *N.J.L.* 401, 3 A.2d 92 (Sup.Ct.1938). In *Bacharach*, the lease contained language obligating the lessor to pay the broker and set forth the terms of the commission arrangement. *Id.* at 404, 3 A.2d 92.